Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHY-LANE
COUNTY COOPERATIVE ELECTRIC
ASSOCIATION; CENTRAL ELECTRIC
COOPERATIVE INC.; CLEARWATER
POWER CO.; CONSUMERS POWER,
INC., COOS-CURRY ELECTRIC
COOPERATIVE, INC.; DOUGLAS
ELECTRIC COOPERATIVE; FALL RIVER
RURAL ELECTRIC COOPERATIVE, INC.;
LANE ELECTRIC COOPERATIVE; LOST
RIVER ELECTRIC COOPERATIVE, INC.;
NORTHERN LIGHTS, INC.; OKANOGAN        No. 05-75638
COUNTY ELECTRIC COOPERATIVE,
INC.; RAFT RIVER RURAL ELECTRIC
COOPERATIVE, INC.; SALMON RIVER
ELECTRIC COOPERATIVE, INC.;
UMATILLA ELECTRIC COOPERATIVE
ASSOCIATION; AND WEST OREGON
ELECTRIC COOPERATIVE, INC.,
                    *Petitioners,*

                v.

DEPT. OF ENERGY; BONNEVILLE
POWER ADMINISTRATION,
                    *Respondents.*

ALCOA, INC.,
                              *Petitioner,*

PUBLIC POWER COUNCIL,
                              *Intervenor,*

                  v.

BONNEVILLE POWER
ADMINISTRATION,
                              *Respondent.*

No. 05-75639

ALCOA, INC.,
                              *Petitioner,*

COLUMBIA FALLS ALUMINUM
COMPANY; INDUSTRIAL
CUSTOMERS OF NORTHWEST
UTILITIES; PUBLIC POWER COUNCIL,
                              *Intervenors,*

                  v.

BONNEVILLE POWER
ADMINISTRATION; DEP'T OF ENERGY,
                              *Respondents.*

No. 06-73756

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHY-LANE
COUNTY COOPERATIVE ELECTRIC
ASSOCIATION; CENTRAL ELECTRIC
COOPERATIVE INC.; CLEARWATER
POWER COMPANY; CONSUMERS
POWER INC.; COOS-CURRY ELECTRIC
COOP., INC.; DOUGLAS ELECTRIC
COOPERATIVE; FALL RIVER RURAL
ELECTRIC COOPERATIVE, INC.; LANE
ELECTRIC COOPERATIVE INC.; LOST
RIVER ELECTRIC COOPERATIVE, INC.;
NORTHERN LIGHTS INC.; OKANOGAN
COUNTY ELECTRIC COOPERATIVE
INC.; RAFT RIVER RURAL ELECTRIC
COOPERATIVE, INC.; SALMON RIVER
ELECTRIC COOPERATIVE INC.;
UMATILLA ELECTRIC; WEST OREGON
ELECTRIC COOPERATIVE, INC.,
                                   *Petitioners,*

                    v.

BONNEVILLE POWER
ADMINISTRATION,
                                   *Respondent.*

No. 06-74223

PACIFIC NORTHWEST GENERATING
COOPERATIVE; BLACHY-LANE
COUNTY COOPERATIVE ELECTRIC
ASSOCIATION; CENTRAL ELECTRIC
ASSOCIATION INC.; CLEARWATER
POWER COMPANY; CONSUMERS
POWER INC.; COOS-CURRY ELECTRIC
COOP., INC.; DOUGLAS ELECTRIC
COOPERATIVE; FALL RIVER RURAL
ELECTRIC COOPERATIVE; LANE
ELECTRIC COOPERATIVE INC.; LOST
RIVER ELECTRIC COOPERATIVE, INC.;
NORTHERN LIGHTS INC.; OKANOGAN          No. 06-74237
COUNTY ELECTRIC COOPERATIVE
INC.; RAFT RIVER RURAL ELECTRIC
COOPERATIVE INC.; SALMON RIVER
ELECTRIC COOPERATIVE INC.;
UMATILLA ELECTRIC; WEST OREGON
ELECTRIC COOPERATIVE, INC.,
                          *Petitioners,*

                v.

BONNEVILLE POWER
ADMINISTRATION,
                          *Respondent.*

ALCOA, INC.,
                          *Petitioner,*

                v.                       No. 06-74797

BONNEVILLE POWER
ADMINISTRATION,
                          *Respondent.*

INDUSTRIAL CUSTOMERS OF
NORTHWEST UTILITIES,
                          *Petitioners,*

                v.

BONNEVILLE POWER
ADMINISTRATION,

                          *Respondents.*

No. 06-75361

ORDER AND
AMENDED
OPINION

On Petition for Review of an Order of the
Bonneville Power Administration

Argued and Submitted
November 7, 2007—Portland, Oregon

Filed December 17, 2008
Amended August 5, 2009

Before: Raymond C. Fisher, Marsha S. Berzon,
Circuit Judges, and Barry Ted Moskowitz,[1] District Judge.

Opinion by Judge Berzon

---

[1]Honorable Barry Ted Moskowitz, District Judge for the Southern District of California, sitting by designation.

## COUNSEL

Michael C. Dotten, Matthew Harrington, Heller Ehrman LLP, Seattle, Washington, for petitioner-intervenor Alcoa, Inc.

Melinda J. Davison, Irion Sanger, Davison Van Cleve, P.C., Portland, Oregon, for petitioner Industrial Customers of Northwest Utilities.

R. Erick Johnson, Lake Oswego, Oregon, for petitioners Pacific Northwest Generating Cooperative, et al.

Karin J. Immergut, United States Attorney; Randy Roach, General Counsel; Stephen J. Odell, Assistant U.S. Attorney; David J. Adler, Special Assistant U.S. Attorney; Timothy Johnson, Assistant General Counsel; Kurt Runzler, Jon D. Wright, J. Courtney Olive; Portland, Oregon, for respondent Bonneville Power Administration.

Leonard J. Feldman, Heller Ehrman LLP, Seattle, Washington, for intervenor Port Townsend Paper Company.

Mark R. Thompson, Portland, Oregon, for intervenor Public Power Council.

---

## ORDER

The opinion filed on December 17, 2008, and published at 550 F.3d 846, is hereby amended as follows:

1. Slip Op. 16570, line 31: Replace <Each of these justification> with <Each of these justifications>

2. Slip Op. 16571, line 4: Remove the sentences <This explanation is undercut, first of all, by the fact that the subsidized rates are supplied to just three firms, all of

which use electric power for the same industrial purpose — smelting aluminum. Thus, the payments do not encourage "diversified" use of electric power, but targeted use.>

3. Slip Op. 16571, line 9: Replace <Moreover, because> with <Because>

4. Slip Op. 16571, lines 15-16: Join the paragraph that begins <Common sense suggests . . .> to the preceding paragraph, which ends <. . . with BPA power.>

5. Slip Op. page 16572, line 17: Replace the sentence <But the exchange program is a specific exception that proves a general rule — and the rule is that Congress intended BPA to operate as a business selling power for profit, not as a charitable institution distributing "benefits." *See, e.g., Ass'n of Pub. Agency Customers*, 126 F.3d at 1171 (citing BPA's "mandate to operate with a business-oriented philosophy").> with <But the exchange program is a specific exception that proves a general rule — and the rule is that Congress intended BPA "to operate with a business-oriented philosophy." *See, e.g., Ass'n of Pub. Agency Customers*, 126 F.3d at 1171.>

6. Slip Op. page 16574, line 22: Replace <§ 832a(f) of the NWPA> with <§ 832a(f) of the Bonneville Project Act>

7. Slip Op. page 16578, line 11: Replace <BPA's petition> with <Alcoa's petition>

8. Slip Op. page 16578, line 12: Replace <BPA's primary argument> with <Alcoa's primary argument>

With these amendments, the panel has unanimously voted to deny the Bonneville Power Administration's Petition for

Panel Rehearing and Port Townsend Paper Corporation's Petition for Panel Rehearing.

The petitions for panel rehearing are DENIED. No further petitions for rehearing or rehearing en banc may be filed.

---

## OPINION

BERZON, Circuit Judge:

### A.   Introduction

At their origins during the New Deal, the Bonneville Project's hydroelectric operations in the Pacific Northwest, administered by the Bonneville Power Administration ("BPA"), were promoted as spreading the benefits of affordable federal power widely, to "the farmer and the factory, and all of you and me."[2] At the same time, the Project gave a vital boost to the aluminum industry of the Pacific Northwest. Indeed, in the early days of the Project, what was good for BPA was good for the aluminum industry, and what was good for the aluminum industry was good for BPA. Aluminum manufacturers received low-cost federal hydroelectric power to operate energy-intensive smelting operations in the Pacific Northwest, and BPA gained a reliable market for a supply of electric power that otherwise greatly exceeded demand in a region where rural electrification was still a work in progress. *See* H.R. Rep. No. 96-976, pt. 2, at 27 (1980), *as reprinted in* 1980 U.S.C.C.A.N. 6023.

BPA's synergistic relations with the aluminum industry during this early period were widely seen as a public good.

---

[2]WOODY GUTHRIE, *Grand Coulee Dam, on* THE COLUMBIA RIVER COLLECTION (Smithsonian Folkways, 1988). Guthrie was commissioned by the federal Works Progress Administration in 1941 to write songs to promote the Bonneville Project.

The aluminum manufacturers and the region's nascent aviation industry, which they supplied, not only brought many high-wage jobs to the Pacific Northwest, but also served as a vital strategic asset for the United States during World War II and the Cold War decades that followed.[3]

Times have changed. Public utilities and electrical cooperatives serve a larger regional population with greater needs for electrical power, *see id.*, to which they are statutorily guaranteed preferential access. *See* 16 U.S.C. § 832c(a).[4] Rising energy prices have made the relatively inexpensive federal power generated by BPA more attractive than ever, not only to BPA's regional " 'preference' customers," *Aluminum Co. of America v. Central Lincoln Peoples' Util. Dist.* ("*Alcoa*"), 467 U.S. 380, 384 (1984), but also to utilities outside the Pacific Northwest.[5]

At the same time, due to a variety of factors — among them higher energy costs — the region's aluminum industry has fallen on hard times. The smelting operations of the major aluminum manufacturers, which traditionally ran on electric power purchased directly from BPA, are generally being operated at reduced capacity, and in some cases, have shut

---

[3]"Now in Washington and Oregon you can hear the factories hum, making chrome and making manganese and light aluminum. And there roars the Flying Fortress now to fight for Uncle Sam, spawned upon the King Columbia by the big Grand Coulee Dam." Guthrie, *supra* note 1. The aluminum-bodied B-17 "Flying Fortress" was the world's first mass-produced large aircraft, with wartime production levels in Boeing's Seattle plant reaching a never-again-equaled sixteen planes per *day*. *See* ROBERT J. SERLING, LEGEND & LEGACY: THE STORY OF BOEING AND ITS PEOPLE 55 (1992).

[4]Unless otherwise noted, all statutory citations are to Title Sixteen of the United States Code.

[5]Numerous opinions of this Court "chronicle the history of BPA and describe the tangle of statutes that govern its operations." *Golden Nw. Aluminum, Inc. v. BPA,* 501 F.3d 1037, 1041 (9th Cir. 2007) (citing cases). Accordingly, we confine our discussion to the particular facts relevant to this appeal.

down entirely. This case centers on how much BPA can or must do, under the authority and mandate conferred upon it by Congress, to aid its longtime, but now ailing, customers.

The assistance largely at issue here consists of three three-party contracts BPA executed in June 2006, each with a local public utility company and one of the aluminum companies that are "direct service industrial" customers ("DSIs") of BPA. In the contracts, BPA committed itself to make payments to the aluminum company DSIs ("aluminum DSIs") totaling a maximum of $59 million per year for five years in lieu of supplying them with actual electrical power, while retaining the option to sell them physical power instead in the final two years. In addition, in September 2006, BPA arranged for the sale of physical power to Port Townsend Paper Company ("Port Townsend"), the sole existing DSI that is not an aluminum manufacturer, via a contract between BPA and a local utility company, Public Utility District Number 1 of Clallam County ("Clallam"), for the sale of physical power, which Clallam would then supply to Port Townsend. Challenges to these four contracts by aluminum DSI Alcoa; the Pacific Northwest Generating Cooperative, an organization of electrical cooperatives that are preference customers of BPA (collectively, "Cooperative"); and Industrial Customers of Northwest Utilities, an organization of firms which purchase electricity from utility companies, rather than directly from BPA (collectively, "Industrial Customers"), form the basis of the seven petitions that have been consolidated in this case. Both Port Townsend and the Public Power Council, an association of consumer-owned utilities, have intervened as interested parties.

## B.   The Statutory Context

To set out the complex statutory landscape against which we consider these challenges, we briefly review the enactments in which Congress over the past seven decades has established and regulated BPA's authority to sell the output of

the Federal Columbia River Power System, as the regional energy generation operations which began with the Bonneville Project are known. *See Golden Nw. Aluminum*, 501 F.3d at 1041.

The Bonneville Project Act of 1937 ("Project Act"), 16 U.S.C. § 832-832j, created BPA as the authority responsible for the "sale and disposition" of the electric energy generated by the federal hydroelectric projects in the Pacific Northwest. *See* § 832a. The Project Act directed that "in disposing of electric energy generated at [the Bonneville] project, [BPA shall at all times] give preference and priority to public bodies and cooperatives." § 832c(a). At the same time, the Project Act also authorized BPA, subject to this preference and priority restriction, to enter into contracts for the "sale at wholesale of electric energy . . . to private agencies and persons." § 832d(a). Historically, there have been two types of private entities that purchase electric power directly from BPA: investor-owned utility companies ("IOUs") and DSIs. *See Ass'n of Pub. Agency Customers, Inc. v. BPA*, 126 F.3d 1158, 1164 (9th Cir. 1997).

Over the following decades, Congress responded to increasing demand for BPA's low-cost federal power within and outside the Pacific Northwest with four additional pieces of legislation relevant to this case:

*First*, in 1964, Congress passed the Regional Preference Act, 16 U.S.C. §§ 837-837h ("RPA"), which provides that the sale of electric energy from "Federal hydroelectric plants in the Pacific Northwest" to customers outside the region must be limited to "surplus energy," § 837a, defined as "energy . . . which would otherwise be wasted because of the lack of a market therefor in the Pacific Northwest at any established rate." § 837(c).[6]

---

[6]The current definition of "surplus energy" reads "electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy." *See* § 839f(c).

*Second*, the Transmission Act, 16 U.S.C. §§ 838-838h, enacted in 1974, established the basic principles that rates for BPA power must

> be fixed and established (1) with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles, (2) having regard to the recovery . . . of the cost of producing and transmitting such electric power, . . . and (3) at levels to produce such additional revenues as may be required, in the aggregate with all other revenues of the Administrator, to pay when due [expenses related to] . . . all bonds issued and outstanding pursuant to this chapter . . . .

§ 838g.

*Third*, the Northwest Power Act, 16 U.S.C. §§ 839-839h ("NWPA"), signed into law in 1980, was triggered by Congress's recognition that demand within the Pacific Northwest for low-cost federal power threatened to outstrip supply, and that BPA's dams were having a significant impact on the region's fish and wildlife. *See Ass'n of Pub. Agency Customers,* 126 F.3d at 1165. The NWPA contains several provisions central to this litigation.

Initially, the NWPA directs that "[w]henever requested," by either a "public body and cooperative entitled to preference under the [Project Act]" or an "investor-owned utility," BPA "shall offer to sell . . . electric power to meet the [requesting entity's] firm power load."[7] § 839c(b)(1). In the same section of the Act, Congress also states that BPA is "au-

---

[7]"Firm power" is power or power capacity that an electric utility promises to deliver to a customer on a non-interruptible basis. "Firm power load" is the total amount of "firm power" that a utility has committed to providing its customers.

thorized to sell in accordance with this subsection electric power to existing [DSI] customers." § 839c(d)(1)(A). The statute then instructs BPA to offer "an initial long term contract" for the sale of electric power to each of its existing DSI customers, § 839c(d)(1)(B), and, under a separate subsection, to its public utility and cooperative customers and IOUs. § 839c(g). The NWPA also authorizes BPA, in § 839c(f), to "sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to [BPA's] obligations incurred pursuant to subsections (b), (c), and (d) of this section[,] in accordance with this and other Acts applicable to [BPA] . . . ."

In addition, the NWPA directs BPA to "establish, and periodically review and revise, rates for the sale and disposition of electric energy," § 839e(a)(1), which are subject to "confirmation and approval by the Federal Energy Regulatory Commission [("FERC")] upon a finding by the Commission" that, among other things, "such rates . . . are based upon [BPA]'s total system costs." § 839e(a)(2)(B). Rates for preference customers are mandated, accordingly, to be sufficient to "recover the costs of that portion of the Federal base system resources needed to supply such loads," § 839e(b)(1), with "Federal base system resources" defined as

> (A)  the Federal Columbia River Power System hydroelectric projects;
>
> (B)  resources acquired by [BPA] in longterm contracts . . . ; and
>
> (C)  resources acquired by [BPA] in an amount necessary to replace reductions in capability of the resources referred to in subparagraphs (A) and (B) of this paragraph.

§ 839a(10). Congress also instructed that "rates applicable to direct service industrial customers shall be established,"

§ 839e(c)(1), at a level that is "based upon [BPA's] applicable wholesale rates to [preference] customers and the typical margins included by such [preference] customers in their retail industrial rates [plus other considerations] . . . ." § 839e(c)(2).

## C.   The Present Litigation

The events that immediately gave rise to this litigation began in June 2005, when BPA initiated the process that resulted in the execution of the contracts challenged here. On June 30, 2005, BPA issued a Record of Decision on Service to Direct Service Industrial (DSI) Customers for Fiscal Years 2007-2011 ("DSI Service ROD"), in which it announced its intention to enter into the three-way contracts with the aluminum DSIs and the local utility companies. The proposed contracts would provide "service benefits," with the default form of delivery of the benefits being "financial payment[s]" by BPA to the DSIs. BPA retained a one-way option, however, in the fourth and fifth years of each of the contracts to discontinue a portion of the payments to a particular DSI and supply that DSI with physical power instead, although the DSI could then elect to refuse service and terminate the agreement. BPA specified that before exercising that option, the agency would conduct a "public process" to consider and explain its decision.

The amount of the payments to the DSIs was determined according to a formula based on the difference between the market price of power and BPA's standard rate for power sold to its preference customers ("PF rate"). Under the default mode, monetary payments to each DSI would be made in an amount equal to this price differential multiplied by the amount of physical power the DSI purchased from the local utility partner, thus tying the value of the benefit to the DSI's electricity use and, therefore, to its level of operations and employment.[8]

---

[8]Under the alternative mode, BPA would supply physical power to the local utility for sale to the DSI at a price to be determined by BPA, but no lower than the PF rate.

Crucially, BPA placed three limitations on the amount of the payments it would make to the DSIs each year. First, BPA obligated itself to make the payments only on the first 560 average megawatts ("aMW")[9] of capacity consumed by the DSIs each year.[10] Second, BPA capped the price differential it was willing to pay the DSIs for the power they purchased on the open market at no more than $24/MWh. Third, BPA limited the total annual benefit the DSIs could receive to $59 million.[11]

---

[9] aMW is a measure of capacity. Power is typically priced by megawatt hours (MWh), a measure of usage, where 1 MWh = 1 hour of use × 1 aMW. Thus, 560 aMW, if used continuously for a year, will equate to 4,905,600 MWh of power usage (560 aMW × 24 hours/day × 365 days/year).

[10] Of the 560 aMW, BPA allocated 100 aMW to GNA, 320 aMW to Alcoa, and 140 aMW to CFAC. Alcoa had requested an allocation of 438 aMW.

[11] The following three simplified hypotheticals illustrate the general contours of the monetary benefit plan and the effect of each of the limitations.

*Hypothetical 1*: Assume the DSIs use 700aMW of power continuously for a year, the average market price for power is $32/MWh in that year, and the rate charged to preference customers ("PF rate") is $30/MWh. If no limitations were in place, the DSIs would be entitled to a monetary payment of $12.3 million (700aMW × 24 hours/day × 365 days/year × ($32/MWh [Market rate] − $30/MWh [PF rate])). However, because the benefit extends only to the first 560aMW used by the DSIs, the actual monetary benefit would total only $9.8 million (560aMW × 24 hours/day × 365 days/year × ($32/MWh − $30/MWh)).

*Hypothetical 2*: Assume that the DSIs use only 200aMW of capacity continuously for a year, but the market price of power for that year is $60/MWh, rather than $32/MWh. Without BPA's limitations, the monetary benefit paid to the DSIs would be $52.6 million (200aMW × 24 hours/day × 365 days/year × ($60/MWh − 30/MWh)). The $24/MWh limitation, however, reduces that benefit to $42.0 million (200aMW × 24 hours/day × 365 days/year × $24/MWh [benefit cap]).

*Hypothetical 3*: Assume the DSIs use only 560aMW of capacity continuously for a year, and the market price of power for that year is $50/MWh. Without BPA's limitations, the monetary benefit owed to the DSIs would be $98.1 million (560 aMW × 24 hours/day × 365 days/year × ($50/Mwh [Market rate] − $30/MWh [PF rate])). The $59 million total annual cap applies, however, and limits the total payment to that amount.

BPA acknowledged in the DSI Service ROD that "service to the DSIs will come at the expense of higher rates paid by . . . preference customers." While BPA stated that it would "not revisit[ ] its . . . decision to serve some amount of DSI load at a known and capped cost," it also indicated — in apparent contradiction — that both the decision to contract with the DSIs and the level of service benefits that it would provide were possibly subject to change. Alcoa and the Cooperative both filed in this Court timely petitions for review of the DSI Service ROD.

On May 31, 2006, BPA issued a Supplement to the DSI Service ROD ("Supplemental ROD"), which announced certain revisions in the agency's plan to contract with the DSIs. In particular, BPA decided to provide "slightly more operating flexibility" to the aluminum DSIs by reducing the minimum level of energy usage required for eligibility to receive the monetary benefit payments.[12] The plan's main provisions, including the service benefit levels and the method of delivery, remained unchanged. Alcoa and the Cooperative again both filed in this Court timely petitions, this time for review of the Supplemental ROD.

In June 2006, less than a month after the issuance of the Supplemental ROD, BPA executed contracts with the three aluminum DSIs — Alcoa, Columbia Falls Aluminum Co. and Golden Northwest Aluminum Holding Co. — under the terms described in the Supplemental ROD. Alcoa and the Cooperative petitioned this Court for review of those contracts as well.

In the DSI Service ROD and the Supplemental ROD, BPA also announced that it would provide Port Townsend with its full requirements for power, seventeen aMW, to be supplied through Clallam. Under the final proposal, the rate for power

---

[12]Under BPA's initial plan, a DSI had to utilize at least 50% of its allocated capacity to be eligible for the monetary benefit. The revised proposal lowered this requirement to 25%.

sold by BPA to Clallam would be set at a level equal to the agency's rate for power sold to local utilities (the PF rate) plus the margin typically charged by the latter to their industrial customers. BPA, Clallam, and Port Townsend then executed contracts providing for power service to Port Townsend through Clallam. Industrial Customers timely filed a petition for review of the contracts.

### D.   BPA's Rate Schedules

Because a central dispute among the parties in this case concerns which of BPA's various power rate schedules should apply to the contracts at issue, a brief overview of the possible rate categories is in order.

BPA is required by its governing statutes to "establish" a number of energy rate schedules for the sale of power to different customer groups. *See* § 839e(a)(1). BPA calculates these rate schedules according to detailed statutory guidelines, *see* § 839e(a)-(h), and promulgates them through a formal ratemaking procedure that includes publication of proposed rates in the Federal Register, public hearings, and FERC approval. *See* § 839e(i). Four of BPA's rate schedules are at issue in this case: the PF rate, the Industrial Firm Power ("IP") rate, the New Resources ("NR") rate, and the Firm Power Products and Services ("FPS") rate.

(a)   PF rate

The PF rate is a cost-based rate at which BPA sells firm power to its preference customers, whose requirements for firm power the agency is required to fulfill. *See* §§ 839c(b), 839e(b). It is calculated pursuant to guidelines specified in § 839(e)(b), and is BPA's lowest published rate. For the year ending September 30, 2007, the average PF rate was $27.33/MWh.

(b)   IP rate

The IP rate is "applicable to [firm power sales] made to direct service industrial customers" and is "established" pursuant to the requirements of § 839(e)(c). Like the PF rate, it is a cost-based rate. *See* § 839(e)(c). For the year ending September 30, 2007, the average IP rate was $45.08/MWh.

(c)   NR rate

The NR rate applies to power sales to utilities that are used by those utilities to serve "new large single load[s]." *See* § 839a(13); the NR rate is intended to penalize DSI customers who attempt to lower their energy costs by purchasing power at lower rates from one of the public utilities that BPA serves instead of purchasing the power directly from BPA at the IP rate. *See* H.R. Rep. No. 96-976, pt. 1, at 25, 51 (describing purpose of NR rate as a deterrent). For the fiscal year ending September 30, 2007, the average NR rate was $77.03/MWh.

(d)   FPS rate

The FPS rate is perhaps the most confounding of BPA's rate schedules, but, because all four of the contracts at issue utilize it, also the most important for this case.

As it does for the PF, IP, and NR rates, BPA establishes an FPS rate schedule pursuant to the ratemaking requirements of § 839e(i), which it then publishes. *See* BONNEVILLE POWER ADMINISTRATION, 2007 WHOLESALE POWER RATE SCHEDULES 55-59 (November 2006) (hereinafter "Wholesale Power Rate Schedule"), *available at* http://www.bpa.gov/power/PFR/rates/2007-09_Power_Rates.pdf. Unlike the other rate schedules, however, the FPS rate schedule includes a provision, entitled "Flexible Rate," which states that energy rates "may be specified at a higher or lower average rate [than the published rate] as mutually agreed by BPA and the Purchaser." *See id.* at 57. In other words, although BPA publishes an FPS

rate schedule, BPA and the contracting customer are free to deviate from this published rate by mutual agreement. *See* Supplemental ROD ("Power is sold under the FPS schedules at rates mutually agreed to by BPA and the purchaser."). Thus, a sale made pursuant to the FPS rate schedule could, in theory, be made at any price. As such, the FPS rate schedule is, in effect, no rate schedule at all.[13]

## II.    Jurisdiction

The NWPA gives this Court, as the "court of appeals for the region," jurisdiction to hear any suit challenging "final actions and decisions taken pursuant to this chapter [of the NWPA] by [BPA]" or to "the implementation of such final actions, whether brought pursuant to this chapter, the [Project] Act, the [Regional Preference Act], or the [Transmission] Act." § 839f(e)(5). The NWPA lists certain BPA actions as representing "final actions subject to judicial review" under the Administrative Procedure Act, 5 U.S.C. §§ 701-06. *See* § 839f(e)(1)(A)-(H).[14] Among the listed actions are "sales . . . of electric power under section 839c of this title." § 839f(e)(1)(B).

All four of the contracts at issue either involve sales of electric power made pursuant to BPA's authority under § 839c or are, at least, "other final" agency actions under § 839f(e)(3), and so are reviewable by this court.[15] Thus, we

---

[13]No party challenges BPA's statutory authority to sell power at mutually agreed upon rates that have not been previously approved by FERC. This Court therefore assumes, without deciding, that BPA has such authority.

[14]The NWPA's jurisdictional grant also contains a "catch-all" provision which makes clear that our jurisdiction to review the agency's action is not confined to the listed actions. *See* § 839f(e)(3) ("Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the . . . Administrator.").

[15]The aluminum DSI contracts do not, under the monetary benefit option, involve the physical delivery of power. They may nonetheless

have jurisdiction to review the validity of the contracts, including (1) whether BPA is authorized and/or obligated to sell power to the DSIs under § 839c; (2) whether BPA is permitted to offer the DSIs monetary benefits in lieu of delivering physical power; (3) whether BPA may offer contract terms to Port Townsend that differ from those offered to the aluminum DSIs; and (4) whether BPA must treat Port Townsend as a "new large single load" for the purposes of its contract with Clallam.[16]

Alcoa and the Cooperative also challenge the actual rates incorporated by BPA into the aluminum DSI contracts. Alcoa argues that it is entitled to purchase power from BPA at a cost-based rate, and that, under the monetary benefit provisions of its contract with BPA — which utilize a mutually agreed upon FPS rate as a baseline — it is, as a practical matter, subject to a market-based rate.[17] The Cooperative, on the

qualify as "sales of electric power" as they are designed to effectuate the delivery of power to the DSIs at a rate agreed upon by the DSIs and BPA, by subsidizing the sale of power actually acquired elsewhere. In any event, the parties do not dispute the characterization of these contracts as "sales of electric power" for jurisdictional purposes. Moreover, the contractual provisions regarding monetary benefits would qualify as "final actions" within the catch-all provision even if not considered to be "sales of electric power under § 839c." As we therefore do not need to sort out whether the monetary benefits provisions are reviewable as "sales of electric power" or under the catch-all for "other final actions and decisions by the . . . Administrator," we do not do so.

[16]The Cooperative argues that the DSI Service ROD and the Supplemental ROD are also final agency actions subject to our review. We find it unnecessary to decide this issue. The four DSI contracts — which, as we have already concluded, are final agency actions subject to our review — incorporate the final decisions made by BPA in the DSI Service ROD and/or the Supplemental ROD. Thus, there is no reason for this Court independently to review the RODs, whether or not they are final agency actions. Any issue that arises from the RODs and is ripe for review also arises from the contracts and is likewise ripe for review. Similarly, any issue unripe for adjudication is unripe under both the RODs and the contracts.

[17]Determining the "rate" that applies to purchases of power by Alcoa is complicated because BPA opted to deliver a monetary benefit rather than

other hand, argues that the rate assumptions that determine the monetary benefit BPA pays to the aluminum DSIs are impermissibly low and thereby result in an unlawful subsidy.

This issue is ripe for review. While this Court ordinarily is not permitted to review rate-making decisions until those decisions are final and have been approved by FERC, *see Ass'n of Public Agency Customers,* 126 F.3d at 1177, 1179, BPA affirmatively stated in the Supplemental ROD that "[a] formal rate proceeding is not legally required for BPA to negotiate a rate within [the FPS] rate schedule . . . and[,] in this case in particular, would add little or nothing to the record already developed . . . ." BPA, in other words, has indicated that it does not plan to seek approval from FERC of the rate assumptions underlying the monetary payments or use the formal rate-making procedures outlined in § 839e(i) with respect to those payments. Because the parties do not challenge BPA's assertion that no formal rate-making procedure, including FERC approval, is required here, we assume, without deciding, that BPA is correct. As BPA plans to take no further action with respect to the amount of monetary benefits specified in the DSI contracts or the method by which they are calculated, the benefit mechanism represents the "consummation of the agency's decisionmaking process" by which

---

physical power. As noted, BPA agreed to pay Alcoa the difference between the rate that Alcoa must pay to purchase physical power (i.e., the market rate) and the PF rate for the first 320 aMW of power Alcoa consumes each year. BPA, however, capped the price differential it is willing to pay at $24/MWh (or less if Alcoa uses more than one-half of its allotted capacity). Thus, if the market price of power exceeds the PF rate by more than $24/MWh (or the applicable cap), Alcoa must pay more than the PF rate for its power purchases, although still less than the market rate. In addition, Alcoa receives no payment — and therefore must pay the full market price — for purchases of power in excess of the 320 aMW limit imposed by BPA. In sum, BPA's contract with Alcoa requires Alcoa to pay a market-*based* rate — although less than the market rate — for the first 320 aMW Alcoa purchases each year, and the full market rate for any purchases above 320 aMW.

BPA's "obligations . . . [were] determined," *see Bennett v. Spear*, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted), and thus qualifies as a final agency action subject to our review under the catch-all review category.

For similar reasons, Industrial Customers' challenge to the rate applicable to the sale of power to Clallam is also ripe for review. Industrial Customers argues that the BPA/Clallam contract rate is impermissibly low because it is "not the DSI rate, the NR rate for new large single loads, or the market price of electricity." Like the rate used to calculate the level of the aluminum DSIs' monetary benefit, the BPA/Clallam contract rate is a negotiated rate made pursuant to the FPS rate schedule. As noted, BPA asserts that it is not legally required to seek FERC approval of a rate negotiated under the FPS rate schedule.[18] Because the agency provides no indication that it nonetheless plans to seek FERC approval of the Clallam contract rates,[19] we can only assume that it does not plan to do so. A review of BPA's notice of proposed 2007 wholesale power rates, which describes the scope of BPA's 2007 wholesale rate-making process, confirms this assumption. *See* 70 Fed. Reg. 67,685 (Nov. 8, 2005). In the ratemaking notice, BPA states:

> The DSI Service decisions [embodied in the RODs] *finalized* and *established* the manner and method by which BPA would provide service and benefits to its DSI customers[, including Port Townsend]. The decisions in that ROD resolved the method and level of service to be provided DSIs in the FY 2007-2011

---

[18]Again, because the parties do not challenge this assertion, we assume, without deciding, that BPA is not legally obligated to conduct a ratemaking proceeding either before or after it negotiates a rate under the FPS rate schedule.

[19]In fact, BPA concedes that this Court has jurisdiction to review ICNU's petition.

> period. Pursuant to § 1010.3(f) of BPA Hearing Pro-
> cedures, the Administrator directs the Hearing Offi-
> cer to exclude from the record any material
> attempted to be submitted or arguments attempted to
> be made in the hearing which seek to in any way
> revisit the appropriateness or reasonableness of
> BPA's decisions made in the DSI ROD.

*Id.* at 67,689 (emphasis added). Because no parties contest BPA's claim that the Clallam contract rates have been "final-ized" and "established," we hold that ICNU's challenge to that rate is ripe for review.

In its final challenge, the Cooperative asserts that BPA lacks statutory authority to allocate the costs it will incur under the contracts with the DSIs into the rates the agency charges its preference customers. We lack jurisdiction to review this challenge, because it is not, at present, ripe for adjudication. *See, e.g.*, *DBSI/TRI IV Ltd. P'ship v. United States,* 465 F.3d 1031, 1038 (9th Cir. 2006).

It has long been established in this circuit that petitions seeking review of BPA's rate-making decisions — including both the allocation to rates of the costs of acquiring additional power, and language in power sales contracts affecting rate-making — are not reviewable until FERC has approved the rates in question. *See Ass'n of Pub. Agency Customers,* 126 F.3d at 1177, 1179; *Pub. Utils. Comm'n of Cal. v. FERC,* 814 F.2d 560, 561 (9th Cir. 1987); *Pub. Utils. Comm'r of Oregon v. BPA,* 767 F.2d 622, 629 (9th Cir. 1985) ("If FERC fails to correct any defects in the methodology [which affected rate-setting], redress is available in the court of appeals," where "any . . . cognizable challenges will be fully reviewable . . . .").[20] Until then, we lack jurisdiction to review PNGC's

---

[20]Although ripeness concerns preclude our consideration of PNGC's challenges to BPA's *allocation* of the costs of contracting with the DSIs, no such concerns limit our jurisdiction to review BPA's authority to con-

challenge to BPA's allocation of the costs of the DSI contracts to its members' rates.

## III.   Merits

### A.   Standard of Review

Petitioners here challenge decisions made by BPA in the DSI Service ROD and Supplemental ROD and embodied in the DSI contracts. We affirm BPA's actions unless they are "arbitrary, capricious, an abuse of discretion, or in excess of statutory authority." *Aluminum Co. of Am. v. BPA,* 903 F.2d 585, 590 (9th Cir. 1990). The basis for each of the challenges brought here is a contention that BPA has exceeded its authority under its governing statutes — the Project Act, the Transmission Act, the NWPA and the RPA — or that its decisions are arbitrary and capricious.

When reviewing a challenge to an agency's statutory authority, "[o]ur inquiry must begin . . . by examining the statutory language." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1169. If "Congress has spoken directly to the issue," so that there is a "clearly expressed intent," *id.* (citing *Chevron U.S.A., Inc. v. NRDC,* 467 U.S. 837, 842-43 (1984)), we "reject administrative constructions of a statute that are incon-

---

tract with the DSIs, and more specifically, to provide monetary benefits in lieu of physical power or to supply power at a rate that has been finalized. In considering the ripeness of petitions challenging BPA contracts, we have distinguished between challenges to contractual provisions on the grounds that those provisions will affect future rate-making and cost allocation decisions, and challenges premised on the contention that the agency lacks statutory authority to agree to specific contractual terms, even though the *injury* asserted is those terms' effect on customers' rates. *See Cal. Energy Res. Conservation & Dev. Comm'n v. Johnson,* 807 F.2d 1456, 1458-59, 1461 (9th Cir. 1986) (dismissing as unripe claims that contractual provisions unlawfully impair BPA's future rate-making and cost allocation procedures, while reviewing claim that contract violates NWPA requirements governing resource acquisition in § 839d(b)).

sistent with the statutory mandate or that frustrate the policy Congress sought to implement." *Aluminum Co. of Am.,* 891 F.2d at 752. "When relevant statutes are silent on the salient question, we assume that Congress has implicitly left a void for [the] agency to fill," and, therefore, we "defer to the agency's construction of its governing statutes, unless that construction is unreasonable." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1169; *see also Golden Nw. Aluminum,* 501 F.3d at 1045.

This Court "has been particularly deferential to BPA," *Portland Gen. Elec. Co. v. BPA*, 501 F.3d 1009, 1025 (9th Cir. 2007), "for three reasons: First, the enabling legislation is highly technical and complex. Second, the Agency was intimately involved in the drafting and . . . [third,] Congress has, for nearly half a century, monitored BPA performance in electricity regulation and allocation." *Pub. Util. Dist. No. 1 v. BPA*, 947 F.2d 386, 390 (9th Cir. 1991) (internal quotation marks omitted). In particular, we have identified the question of "how best to further BPA's business interests consistent with its public mission" as a statutory "gap" that Congress left to BPA to fill. *Ass'n of Pub. Agency Customers,* 126 F.3d at 1171 (internal quotation marks omitted). Applying appropriate deference, we uphold the agency's assessment of whether its actions "further BPA's business interests consistent with its public mission," so long as the assessment is not unreasonable. *Id.*

### B.   BPA's Obligation To Supply the DSIs' Requirements for Physical Power at a Cost-Based Rate

Alcoa, the Cooperative, and BPA each offers a different interpretation of BPA's statutory authority to sell power to the DSIs. Alcoa asserts that § 839c(d) obligates the agency to sell DSIs power at a cost-based rate. By contrast, the Cooperative contends that § 839c(d) is no longer operative, and that BPA therefore has no authority to sell power to DSIs thereunder, but instead must price its sales to DSIs at market rates. BPA

argues for a middle ground: it maintains that § 839c(d) authorizes but does not obligate it to sell power to the DSIs. The agency does not stop there, however. It further contends that, because it is not obligated to sell power to the DSIs, it may use its § 839c(f) authority to sell the DSIs power at an FPS rate without first offering them power at the cost-based IP rate.

For the reasons discussed in detail below, we conclude that none of these positions is entirely correct. We agree with BPA that § 839c(d) authorizes but does not obligate the agency to sell power to the DSIs. However, we also hold that, if the agency chooses to offer firm power to the DSIs, whether pursuant to its § 839c(d) or § 839c(f) authority, it must first offer them the IP rate.

## 1.  Obligation To Sell Power to the DSIs

Alcoa argues that BPA's decision to guarantee only a capped, monetary benefit to the aluminum DSIs in the contracts violated the NWPA, because the NWPA creates a perpetual obligation for BPA to satisfy the DSIs' full energy requirements through sales of power at a cost-based rate. The Cooperative claims, on the other hand, that since the expiration in 2001 of the initial long term contracts mandated by § 839c(d)(1)(B), BPA no longer has authority to sell power to the DSIs under § 839c(d)(1), and, therefore, any such sale must be authorized by § 839c(f)'s provisions for the agency's sale of surplus power at a market rate. *Compare* 16 U.S.C. § 839c(d)(1)(A) ("[BPA] is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers.") *with* § 839c(f) ("[BPA] is authorized to sell, or otherwise dispose of, electric power, including power acquired pursuant to this and other Acts, that is surplus to [its] obligations incurred pursuant to subsections (b), (c), and (d) of this section, in accordance with this and other Acts applicable to [BPA] . . . ."). Because, as we explain, Congress has not "clearly expressed [its] intent" in § 839c(d), we defer

to BPA's reasonable construction of the statutory text. *Ass'n of Pub. Agency Customers,* 126 F.3d at 1169. Doing so, we hold here — as we have previously assumed, but not decided[21] —that neither petitioner is entirely correct, and that "§ 839c(d) authorize[s] but d[oes] not obligate BPA to sell the DSIs any power." *M-S-R Pub. Power Agency v. BPA,* 297 F.3d 833, 838 (9th Cir. 2002).[22]

Section 839c(d)(1) reads:

(A)   The Administrator is authorized to sell in accordance with this subsection electric power to existing direct service industrial customers. Such sales shall provide a portion of the Administrator's reserves for firm power loads within the region.

(B)   After [the effective date of this Act, BPA] shall offer in accordance with subsection (g) of this section to each existing direct service industrial customer an initial long term contract that provides such customer an amount of power equivalent to that to

---

[21]*Compare M-S-R Pub. Power Agency v. BPA,* 297 F.3d 833, 838 (9th Cir. 2002) (stating in a case involving a challenge to BPA's calculation of the amount of power that the agency could sell to non-DSI customers *outside* the Pacific Northwest under § 832m, that "after October 2001 . . . § 839c(d) authorized but did not obligate BPA to sell the DSIs any power") *with Golden Nw. Aluminum Co.,* 501 F.3d at 1045 (holding that an earlier, unpublished decision, which had dismissed as untimely a challenge to BPA's contracts to sell power to the DSIs after the expiration of the initial long-term contracts, was *res judicata* with regard to BPA's authority to sell power to the DSIs under those contracts, but "express[ing] no independent view as to whether . . . § 839c(d) [ ] permits BPA to contract with its DSI customers").

[22]Although the Supreme Court noted in *Alcoa* that, under the NWPA, the "preference rules [for regional customers] will apply to any subsequent contracts made with DSIs [following the initial long-term agreements]," it expressed no view regarding whether such "subsequent contracts" would or could include agreements for sales of firm power under § 839c(d). 467 U.S. at 395 n.10.

which such customer is entitled under its contract dated January or April 1975 providing for the sale of "industrial firm power."

Alcoa maintains that the use in § 839c(d)(1)(B) of the term "initial" in describing the initial long term contracts indicates Congress's intent that BPA is required to enter into successor agreements. Alcoa suggests that any interpretation to the contrary would render Congress's use of the word "initial"[23] superfluous, in contravention of basic principles of statutory construction. *Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991). The Cooperative argues, to the contrary, that the phrase "in accordance with this subsection," § 839c(d)(1)(A), means that BPA's authority to sell power to the DSIs extends *only* to the "initial long term contracts" specified in § 839c(d)(1)(B), particularly because § 839c (d)(3) states that the agency "shall not sell amounts of electric power, including reserves, to [the] existing [DSIs] in excess of the amount permitted under [§ 839c(d)](1)," unless specific requirements, not present here, are met.

The statutory text is far from clear, but, for several reasons, does not compel the conclusion that successor sales agreements with the DSIs under § 839c(d) are prohibited.

*First*, § 839c(d)(3) specifies neither what is meant by the "the amount permitted under [§ 839c(d)](1)," nor, therefore, what additional sales are prohibited. It is true that the provision could be read to ban *any* sales of industrial firm power subsequent to those made under the initial long term contracts. On the other hand, it also could be understood as prohibiting only *concurrent* sales — that is, while the original long-term contracts were still in effect — "in excess of the amount permitted under [§ 839c(d)](1)," but not affecting

---

[23]"Initial" means "related to, or occurring at the beginning." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).

*subsequent* sales of power — that is, after the initial agreements expired.

**[1]** BPA has adopted the latter interpretation. Its position is that it now can make new sales of power to the DSIs under § 839c(d)(1)(A), even though it previously had asserted in *Kaiser Aluminum & Chem. Corp. v. BPA,* 261 F.3d 844 (9th Cir. 2001), that it could not make such sales during the term of the initial agreements. *See id.* at 849-850 (discussing BPA's position that during the term of the initial long term contracts, the agency could not sell power under § 839c(d) in addition to that provided under the initial long-term agreements mandated in § 839c(d)(1)(B)). BPA's understanding of § 839c(d)(3) is a reasonable construction of ambiguous language and is therefore entitled to *Chevron* deference. The agency's construction of the subsection does not contradict BPA's position at the time of *Kaiser,* because *Kaiser* involved sales during, rather than after, the term of the initial agreements. *See* 261 F.3d at 849-850.

*Second*, the use of the phrase "initial contract" gives rise to a reasonable inference that contracts following the initial long term agreements are not precluded; "initial" suggests that others may follow. The statutory context lends considerable support to this interpretation, as it provides for "initial long-term contracts" for BPA's preference customers and the IOUs as well as for the DSIs, *see* § 839c(g)(1), and definitively contemplated follow-on contracts, after the term of the initial agreements, for those groups of customers. *See* § 839c(b)(1), (b)(3), (c)(1); *see also Ass'n of Pub. Agency Customers,* 126 F.3d at 1166 (noting that "[t]he DSIs' 1981 Contracts with BPA required any DSI wanting to continue purchasing BPA power after the 20-year term to request a replacement contract by June 30, 1993," thereby assuming the authority, but not the obligation, to enter into such contracts).

*Third*, the inclusion of § 839c(d)(1)(A) in the Act as a separate, general grant of authority to BPA to sell power to the

DSIs also suggests that the agency's authority to do so is not limited to the specific mandate to offer initial long-term contracts set forth in § 839c(d)(1)(B). Subsection 839c(d)(1)(A) states what BPA "is authorized" to do — sell power — without specifying any time limitation; subsection (d)(1)(B) provides what BPA "shall" do with respect to a limited time period. BPA's authorized-but-not-obligated interpretation thus has the advantage of giving full effect to the statutory text. *See Cent. Montana Elec. Power Coop., Inc. v. Adm'r of the BPA,* 840 F.2d 1472, 1478 (9th Cir. 1988). In contrast, under the Cooperative's interpretation, the general authorization contained in subsection (A) is superfluous; subsection (B) would suffice if all that was intended was an obligation to enter into one set of contracts.

*Finally*, BPA's authorized-but-not-obligated understanding of the interrelationship of subsections (A) and (B) is also consistent with the Act's legislative history. The House Interior Committee's report on S. 885 states that "[s]ection 5(d)(1) authorizes [BPA] to sell power to its existing direct-service industrial customers *and* requires [the agency] to offer to such customers initial long-term power sale contracts." H.R. Rep. No. 96-976, pt. 2, at 34 (1980) (emphasis added). Similarly, the House Commerce Committee Report on S. 885 — the bill that became the NWPA, *see Cal. Energy,* 807 F.2d at 1464 — states that "[s]ection 5(d) authorizes the Administrator to sell power to existing direct service industrial customers." H.R. Rep. No. 96-976, pt. 1, at 61 (1980). The report goes on to explain that, in addition to mandating that "[i]nitial long-term 20-year contracts are to be offered by BPA" to the DSIs, "[s]ubsequent contracts . . . are authorized but not mandated." H. Rep. No. 96-976, pt.1, at 61 (1980).

**[2]** We conclude that BPA is authorized to sell the DSIs non-surplus power under § 839c(d)(1)(A).

At the same time, we do not adopt Alcoa's suggested interpretation — that BPA is *obligated*, rather than merely autho-

rized, to sell power to the DSIs. Contrary to Alcoa's suggestion, the phrase "initial long-term contract" does not necessarily indicate that successor agreements are required rather than permitted. That an object is at the "beginning" of a process in no way dictates that the process will continue in perpetuity. Certainly, every time Alcoa signs an "initial contract" with one of *its* customers, the company does not believe it is entering into a lifelong commitment.

Alcoa nonetheless contends that if Congress had meant to obligate BPA to enter into only one long-term contract with the DSIs, it would have simply referred to a "long-term contract," not an "initial long-term contract." But "initial" could have been meant just as a reference back to subsection (A), confirming that there may be later contracts as well.

The interpretation Alcoa suggests is not one that we, BPA, or, for that matter, Alcoa itself, previously has taken from the text of § 839c(d)(1)(B). *See M-S-R,* 297 F.3d at 838. Nor is Alcoa's perpetual obligation position consistent with the meaning that members of Congress involved in the NWPA's enactment ascribed to the section. *See* H.R. Rep. No. 96-976, pt. 1, at 61 (stating that after the "[i]nitial long-term 20-year contracts[,] . . . . [s]ubsequent contracts . . . are authorized but not mandated.").

Alcoa sees evidence to the contrary in the legislative history of the NWPA and in BPA's own understanding of the Act at the time of its passage. The company points to a statement in the House Interior Committee Report on S. 885 that § 839c(b) "mandates continued BPA power sales to existing [DSIs]," H.R. Rep. No. 96-976 Pt. 2 at 48, and a statement by BPA's administrator that the NWPA "contemplates in [§ 839c(d)] additional, future contracts with each existing [DSI]" following the initial agreements. Alcoa reads too much into these statements.

Nothing in the above-quoted sentence from the Committee Report or its surrounding text indicates that "continued . . .

power sales" is for sales *after* the initial agreements, as opposed to the initial agreements themselves (which are, of course, "mandate[s]"). Indeed, additional language in the Committee Report supports the latter interpretation: "Existing DSIs will receive the amount of power to which they are entitled under present 'Industrial Firm' power sales agreements." H.R. Rep. No. 96-976, pt. 2, at 48. Moreover, BPA's administrator's statement that subsequent contracts are "contemplated" under § 839c(d) — a far from imperative term — is completely consistent with the view that the Act "authorized but did not obligate BPA to sell the DSIs any power." *M-S-R,* 297 F.3d at 838.

**[3]** Alcoa further argues that because "[u]nder accepted canons of statutory interpretation, we must interpret statutes as a whole," *Boise Cascade,* 942 F.2d at 1432, Congress's mention of sales to the DSIs in various sections of the NWPA shows that it intended BPA to have an ongoing obligation to sell power to them. The strongest support for this contention is the requirement in § 839c(d)(1)(A) that "sales [to the DSIs] shall provide a portion of the [BPA]'s reserves for firm power loads." Alcoa maintains that this language requires ongoing sales by BPA to the DSIs, so as to provide these reserves.

**[4]** Again, the plain text of the statute permits but does not command the interpretation Alcoa suggests. The language in question *could* be read to recognize such a requirement. But it also reasonably can be read to mean that *if* BPA elects to sell power to the DSIs under § 839c(d), a portion of this power must be available to BPA as reserves. BPA adopted the latter interpretation as more consistent with the NWPA as a whole, which, according to BPA, indicates that Congress was focused on assuring that BPA has some reserves to protect its operations, rather than on the particular source of these reserves. *See, e.g.*, § 839a(17) (defining "[r]eserves" as "electric power needed to avert particular planning or operating shortages . . . [that are] available to [BPA] (A) from resources *or* (B) from rights to interrupt . . . portions of the electric

power supplied to customers.") (emphasis added). BPA's interpretation of the ambiguous "reserves" language is reasonable, and so entitled to *Chevron* deference.

Nor do the other sections of the NWPA which discuss sales to the DSIs compel us to reach the conclusion Alcoa proposes. Contrary to Alcoa's assertion, the fact that § 839e(b)(2)(A)(I) requires BPA to take into account the costs of "[DSI] customer loads *which are . . .* served by [BPA]" (emphasis added), in its rate ceiling does not prove that DSI loads *must* be served by BPA. Again, it is just as reasonable to read the provision to require that *if* BPA chooses to serve DSI loads, it must take the costs of such service into account.

Along these same lines, the fact that we have construed § 839b(d)(2), which provides that BPA must act in accordance with a regional power plan,[24] to require that BPA's regional plan reflect loads for which the DSIs have *requested* service, *see M-S-R*, 297 F.3d at 844, does not mean that BPA is obligated to satisfy that request. Instead, our stated assumption when announcing this holding was that BPA is "authorized but . . . not obligate[d]" to serve the DSIs. *Id.* at 838.

Alcoa's position that the NWPA must be understood to mandate perpetual sales to the DSIs is further undermined by another consideration: When Congress did want to impose an obligation to supply a class of customers with their requirements for power, it did so quite explicitly. With regard to preference customers and the IOUs, the NWPA provides that, "*[w]henever requested*, [BPA] *shall* offer to sell to each requesting public body and cooperative entitled to preference

---

[24]Section 839b(d)(2) states: "Following adoption of the [regional conservation and electric power] plan and any amendment thereto, all actions of the Administrator pursuant to section 839d of this title [— which concerns the acquisition of resources to meet BPA's contractual obligations —] shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter."

and priority . . . and to each requesting [IOU] electric power to meet the firm power load of such [customer] . . . ." § 839c(b)(1) (emphasis added). The DSIs are not mentioned as customers to whom this language applies, and the NWPA does not contain any other equivalent provision concerning BPA's sales to them. While Congress specifically directed BPA to provide "initial long-term contracts" to *all* of its traditional classes of customers, *see* § 839c(g)(1)(A)-(D), it only mandated that the agency provide power "whenever requested," § 839c(b)(1), to only *some* of them — and not to the DSIs. We must infer, therefore, that Congress intended to exclude service to the aluminum DSIs from this general mandate. *See White v. Lambert*, 370 F.3d 1002, 1011 (9th Cir. 2004) ("It is axiomatic that when Congress uses different text in 'adjacent' statutes it intends that the different terms carry a different meaning."); *see also, e.g., Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) (applying the canon of *expressio unius est exclusio alterius*).[25]

----

[25]The difference in treatment between sales to preference customers and IOUs on the one hand and sales to DSIs on the other is reflected in the legislative history of the NWPA. Concerning sales of power to preference customers and the IOUs, the House Interior Committee Report states,

> [S]ection 5(b)(1) requires the Administrator, if requested, to enter into long-term power sale contracts with both preference and investor-owned utilities in the region to supply them with the firm power they need to meet their firm loads . . . .

H. Rep. No. 96-976, pt. 2, at 33 (1980). "The practical effect of this mandate," the report observes, is that "preference utilities . . . will continue to have all their firm power needs in the region met by BPA . . . ." *Id.* No such consequences are noted in regard to sales to the DSIs. *See id.* at 34 ("Section 5(d)(1) . . . *authorizes* the Administrator to sell power to its existing direct-service industrial customers and requires him to offer to such customers *initial* long-term power sale contracts. . . .") (emphasis added). Thus, the committee report suggests that Congress was creating an *ongoing* requirement that BPA provide "long-term power sale contracts" to preference customers and the IOUs, but was only requiring "*initial* long-term power sale contracts" for the DSIs. *Id.* (emphasis added).

**[5]** We conclude, in sum, that BPA's interpretation of the NWPA as authorizing but not obligating the agency to sell nonsurplus firm power to the DSIs is a reasonable one. We therefore reject both the Cooperative's contention that such sales are prohibited and Alcoa's contention that BPA has an ongoing obligation to sell power to the DSIs under § 839c(d)(1).

### 2.    Obligation to Offer Power at a Cost-Based Rate

As explained in note 17, *supra*, under the monetary benefit provisions in the aluminum DSI contracts, the rate the DSIs ultimately pay for the physical delivery of power once the BPA monetary payments are taken into account, while below the market rate, is nonetheless subject to market fluctuations and increases when market rates rise above a certain point. Unhappy with this exposure to market volatility, Alcoa argues that BPA must sell it power at a purely cost-based rate that does not vary with market rates. By contrast, BPA asserts that its governing statutes do not obligate it even to offer the DSIs a cost-based rate, let alone supply power (or its monetary equivalent) at such a rate. Rather, BPA contends that it may offer power to the DSIs as "surplus" power under § 839c(f) at the FPS rate schedule — which, as discussed, we are assuming permits BPA to offer power at any mutually-agreed upon rate, including market-based rates — without first offering that power to the DSIs at one of its FERC-approved, cost-based rates.

Alcoa does not clearly indicate which of BPA's three published cost-based rates — the PF rate, the IP rate, and the NR rate — it believes it is statutorily entitled to. Because the IP rate, which § 839e(c) describes as "the rate . . . applicable to direct service industrial customers," is the most obvious contender, we consider that rate first.

### a.    The IP rate

According to BPA's interpretation of the NWPA, the IP rate applies only to sales that BPA makes to DSIs pursuant to

§ 839c(d). *Id.* BPA then notes, as we have also concluded, that § 839c(d) authorizes, but does not obligate, the agency to sell power to the DSIs. The agency concludes from this circumstance that any power in excess of that (1) which is requested by its preference customers or IOUs under § 839c(b) and (c), or (2) which the agency itself elects to sell the DSIs under § 839c(d), qualifies as "[s]urplus power" that BPA is authorized "to sell, or otherwise dispose of" under § 839c(f). BPA sells such "surplus power" pursuant to the FPS rate schedule at a negotiated FPS rate. Thus, by refusing to sell to the DSIs pursuant to its authority under section 839c(d), BPA believes, it can effectively create "surplus power" that it can then offer to sell to the DSIs (or any other in-region customers) at any rate it chooses.

BPA's interpretation of § 839e(c) and its relationship with § 839c(d) is unreasonable on two grounds. First, it ignores the plain language of the statute and, in so doing, renders the IP rate superfluous. Second, it runs counter to the NWPA's legislative history, which evinces Congress's intent that BPA offer power to the DSIs, if at all, at the IP rate, not at some other rate of its choosing. For these reasons, we hold that BPA, when entering into contracts for the sale of firm power to a DSI, must initially offer the IP rate.[26] Only after the DSIs have refused to purchase power at the IP rate may BPA offer them power under the FPS rate schedule.

---

[26]This holding pertains to sales, like the contracts at issue, of "firm power" to DSI customers. *See* Wholesale Power Rate Schedule at 130 (defining "firm power" as "electric power (capacity and energy) that BPA will make continuously available under contracts executed pursuant to Section 5 of the Northwest Power Act"). We are not deciding whether BPA must offer the IP rate to DSIs when selling "nonfirm" power.

**Volume 2 of 2**

### i.   Statutory Analysis

[6] The language of § 839e(c), which is entitled "Rates applicable to direct service industrial customers," does not support BPA's contention that the IP rate applies only to sales made pursuant to § 839c(d). Section 839e(c) states, in relevant part,

(1)   The rate or rates applicable to direct service industrial customers shall be established — . . .

(B)   for the period beginning July 1, 1985, at a level which the Administrator determines to be equitable in relation to the retail rates charged by the public body and cooperative customers to their industrial consumers in the region.

(2)   The determination under paragraph (1)(B) of this subsection shall be based upon the Administrator's applicable wholesale rates to such public body and cooperative customers and the typical margins included by such public body and cooperative customers in their retail industrial rates but shall take into account —

(A)   the comparative size and character of the loads served,

(B)   the relative costs of electric capacity, energy, transmission, and related delivery facilities provided and other service provisions, and

(C)   direct and indirect overhead costs, all as related to the delivery of power to industrial customers, except that the Administrator's rates during such period shall in no event be less than the rates in effect for the contract year ending on June 30, 1985.

The statutory text does not reference section 839c(d) or otherwise suggest the limitation BPA reads into it. Rather, it straightforwardly — and generally — states "the rate or rates applicable *to direct service industrial customers* shall be established" pursuant to certain standards. § 839e(c) (emphasis added).

Second, and more importantly, BPA's position would render the IP rate a nullity. If this Court were to adopt BPA's interpretation of §§ 839e(c) and 839c(d), BPA would retain complete discretion over the decision whether to offer DSIs power at the purely cost-based IP rate or at an FPS rate of BPA's choosing, including a market-based rate higher than the IP rate. Basic economics establishes that a rational seller of a commodity product, if provided a choice between the market rate and a cost-based rate, will either choose to offer the market rate (if the market rate exceeds the cost-based rate) or be forced to accept the market rate (if the market rate is below the cost-based rate). Thus, BPA, if acting rationally and in accordance with its "mandate to operate with a business-oriented philosophy," *see Ass'n of Pub. Agency Customers,* 126 F.3d at 1171, would *never* sell power to the DSIs at the IP rate.[27] Why would Congress have required BPA to "establish" a rate, specified the formula it would be "based upon," and stated that "*the* rate or rates" are "applicable to [DSI] customers," § 839e(c) (emphasis added), if that rate could not possibly apply to any sale?

In its initial ROD, BPA states that it chose not to use the IP rate as the baseline for calculating the monetary benefits payable to the DSIs because it believed the DSIs could not afford the rate and would therefore reject any contract that provided power (or its monetary equivalent) at that rate. Whether or not this assertion is correct, it does not excuse BPA's failure to at least offer the rate, because the DSIs will not always prefer an FPS rate.

**[7]** In *Kaiser*, for example, the DSIs sought to purchase power at the IP rate once that rate became more economical than a market-based FPS rate. *See Kaiser*, 261 F.3d at 848. Were we to agree that BPA has complete discretion to select between the IP rate and an FPS rate, BPA would, as noted,

---

[27]Except, of course, in the extremely unlikely event that the IP rate and the market rate were identical.

always choose an FPS rate, and the DSIs would never receive the option to purchase power at the IP rate. Our conclusion is supported by BPA's actions in *Kaiser*, where, when presented with the opportunity to charge an FPS rate rather than the IP rate, BPA did so. *See id.* Because Congress must have intended the IP rate to apply to at least *some* contracts, we conclude that BPA must at least offer the IP rate, established pursuant to section 839e(c), to the DSIs before entering into a contract with the DSIs at a rate authorized under the FPS rate schedule.[28]

## ii. Legislative History

Our conclusion that BPA's interpretation of its governing statutes is unreasonable is further underscored by the fact that it contradicts the legislative history of the Act. That history contains extensive evidence that Congress intended the IP rate to be the default price for sales of power to the DSIs, and

---

[28]At oral argument, as in its opening brief, Alcoa alleged that the rate BPA agreed to charge Clallam — a rate "equal to [the PF rate] . . . plus the typical industrial margin used to establish the [IP rate]"— "mirror[s] the statutory standard for [the IP] rate[ ] found at" § 839e(c). *See* § 839e(c)(1)-(2) (stating that the IP rate shall be established at a rate "equitable in relation to . . . [the PF rate plus] the typical margins included by [public utilities and cooperatives] in their retail industrial rates [plus other factors]"). Counsel for Alcoa then asserted that, because the Clallam contract rate is equivalent to the IP rate, the company is entitled to the Clallam contract rate. This argument is without merit for two reasons. First, although the language BPA used to describe the Clallam contract rate is similar to the language that describes the method by which the IP rate is calculated, the Clallam contract expressly indicates that the rate is an agreed-upon FPS rate, not the IP rate. Second, the rate which appears in the Clallam contract could not possibly be the equivalent of the rate that BPA is required to establish under § 839e(c), because the agreed-upon rate of approximately $28/MWh is $17/MWh less than the published IP rate for the year ending September 30, 2007. In short, although the Clallam contract rate appears, at first glance, to be the same thing as the IP rate, it is *not* the IP rate to which the DSIs are entitled. The IP rate that BPA must offer the DSIs is the one it establishes pursuant to § 839e(c) and (i).

gives little indication that Congress intended BPA to have discretion to offer them power at a self-created FPS rate instead.

First, relevant Committee Reports make clear that "rates applicable to direct service industrial customers" are those set under Section 7(c) of the Act, i.e., § 839e(c). H.R. Rep. No. 96-976, pt. 1, at 69 ("Section 7(c) prescribes the rates applicable to direct service industrial customers."); S. Rep. No. 96-272 at 59 ("This rate applies to all 'Industrial Firm' sales to BPA's direct-service industries . . . [for] 1985-86 *and all future [sales]*.") (emphasis added).

By contrast, there is no indication that Congress intended BPA to offer power to the DSIs at rates set under § 839e(f), when it can do so at a rate set under § 839e(c). The House Commerce Committee Report describes Section 7(f) of the Act, which became 16 U.S.C. § 839e(f), as providing the authority for "establish[ing] the rate or rates for sales to investor-owned utilities other than sales pursuant to the [residential] exchange [program], preference customers for power needed to meet the requirements of new large single 'loads' and all other miscellaneous sales." H.R. Rep. No. 96-976, pt. 1, at 69. Noticeably absent from this list are direct sales to DSIs. Similarly, sales made under § 7(f) are described in the Senate Report as exclusive of sales to the DSIs under §7(c) (§ 839e(c)). *Compare* S. Rep. 96-272 at 56 (discussing § 7(c) and stating that "after June 1985 the rate applicable to BPA direct service industrial customers will be based upon the retail rates applicable to industry served by BPA preference utility customers.") *with id.* at 60 ("[S]ubsection 7(f) of the proposed legislation[:] . . . [t]his rate applies to *all other* firm sales including but not limited to (1) Investor-owned utility total load growth . . . (2) New Large Industrial loads served by preference customers; (3) Amounts of additional power needed by Regional Rate loads . . . once such loads exceed the

capability of the Federal Base System resources and the IOU Exchange Power . . . .") (emphasis added).[29]

### iii.    *Kaiser Aluminum*

BPA's capstone argument on this point is that its decision not to sell power to the DSIs at the IP rate cannot be unreasonable as it is consistent with the decision in *Kaiser Aluminum & Chem. Corp. v. BPA,* 261 F.3d 843 (9th Cir. 2001). In *Kaiser Aluminum*,

> Petitioners argue[d] that the only rate established for the sale of the Surplus Firm Power is the IP-96 rate, and BPA abused its authority when it refused to sell the Surplus Firm Power at that rate. Petitioners further contend[ed] that because BPA refused to sell Petitioners the Surplus Firm Power at the IP-96 rate and evidence indicates that BPA sold power at the FPS-96 rate outside the Pacific Northwest, Petitioners were not granted their regional preference under the Preference Act.

---

[29]Contrary to BPA's assertions, the legislative history of 16 U.S.C. § 832m, the later-enacted provision which establishes "excess Federal power," *id.*, as a "subspecies of surplus power," *M-S-R-,* 297 F.3d at 837, does not support the agency's contentions regarding the rate at which BPA must offer power that is *not* "excess federal power" to regional customers before selling it outside the region. Congress's expectation that BPA "would offer excess power first to regional customers under the same essential rate . . . as for the proposed out-of-region sale[s]," H.R. Rep. No. 104-293, at 91 (1995) is not a basis for inferring that the same would be true of sales that do not involve excess power.

As the passage in the conference report that BPA cites in support of its argument makes clear, the only energy that can be sold as excess power is "power abandoned by regional customers and . . . power generated or purchased for the benefit of fish and wildlife." *Id.* A key reason for creating the "excess federal power" category was to remove otherwise applicable regional preference restrictions in the case of sales of power that has been "abandoned by regional customers." *Id.* The passage BPA cites does not speak to the "applicable rate schedule" for sales to regional customers of power that they have not "abandoned." *Id.*

261 F.3d at 848. The IP-96 rate was, at that time, the rate "applicable to [DSI] customers" under § 839e(c), while the FPS rate was a rate schedule for sales of "all other . . . power," under § 839e(f). *See Kaiser*, 261 F.3d at 850. Our holding in *Kaiser* was that "BPA acted reasonably and in conformity with governing statutes when it offered to sell [the DSIs] Surplus Firm Power at the FPS-96 rate, and rejected Petitioners' offers to purchase such power from BPA at the IP-96 rate." *Id.* at 851. Despite a superficial similarity to the circumstances of this case, for reasons we now explain *Kaiser* does not negate but, instead, underscores the unreasonableness of BPA's interpretation of its governing statutes as applied here.

Most importantly, BPA glosses over key distinctions between the statutory and factual context in *Kaiser* and the one we face here. In *Kaiser,* the DSIs sought to purchase power from BPA in 1999, prior to the 2001 expiration date of the initial longterm contracts mandated by the NWPA. *See id.* at 846, 848. The DSIs had, however, terminated or waived portions of their purchase rights under the initial longterm contracts, so the power the DSIs wanted to buy was "surplus to BPA's long term obligations" to them under the contracts. *Id.* at 846-47, 851.[30]

---

[30]As we recounted in *Kaiser,* the reason the DSIs relinquished these rights was that in the mid-1990s the market price for electric energy, and, thus, the FPS rate, was, for a time, actually *lower* than the IP rate for power sold to the DSIs under the initial longterm contracts. *Id.* at 846. As a result, "the market prevent[ed] BPA from selling any additional power to the DSIs under their [initial] power sales contract[s]." *Id.* at 850 (quoting BPA 1996 Rate ROD). When the DSIs terminated or waived the portions of their power allotments, the power they could have purchased under the initial contracts thus became surplus firm power. *Id.* at 850 ("[O]ne of the reasons BPA has available surplus power is because [DSI] Petitioners reduced their obligation to purchase power under their previous long term power sales contracts."). When energy prices rose again in the late 1990s, making the IP rate attractive once again, these DSIs tried to obtain new agreements from BPA to purchase power at that rate. *See id.* at 848.

The agency's position in *Kaiser*, therefore, was not simply that it had no *obligation* to make the new sales under the § 839e(c) rates that the DSIs wanted, but that it also lacked statutory *authority* to do so under § 839c(d). BPA's contention, which we accepted, was that the requested transactions would constitute a sale under § 839c(d) of power "in excess"[31] of the initial longterm contracts, which was prohibited by § 839c(d)(3).[32] *Kaiser*, 261 F.3d at 850. BPA, we concluded, could not sell power to the DSIs at the IP-96 rate because this rate was established only for industrial firm power, which, at that time, could be sold only under the original longterm agreements. *See id.* at 850 ("[A]dditional power sales to DSIs are not covered by Section [839e](c), under which the IP-96 rate was authorized, because that section requires the establishment of rates for DSIs under Section [839c](d), the section which provides for the sale of Industrial Firm Power by means of long term contracts with the DSIs.").

In sum, the power the DSIs sought to purchase from BPA in *Kaiser* was energy that was not required by the agency's preference customers or the IOUs, but that also could not be sold to the DSIs at the IP-96 rate. *See id* at 848-50. We did not face in *Kaiser*, as we do here, a situation in which the agency has failed to offer the DSIs contracts for industrial firm power at the IP rate even though it is authorized to do so.

---

[31]Section 839c(d)(3) states: "The Administrator shall not sell amounts of electric power, including reserves, to existing direct service industrial customers in excess of the amount permitted under [§ 839c(d)(1)] unless [certain specific conditions are met]."

[32]The position BPA articulated in *Kaiser* was that: (1) "the IP-96 rate" was "applicable [only] to the sale of Industrial Firm Power" (2) "Industrial Firm Power" is limited to power that "that BPA will make continuously available to a direct-service industrial (DSI) purchaser subject to the terms of the Purchaser's power sales contract with BPA"; and (3) as a result, the DSIs "are entitled to purchase under the IP-96 rate only that amount of power each has agreed to purchase under the 1981 power sales contracts or the 1996 Block Sales Contracts." *Kaiser*, 261 F.3d at 849.

Indeed, BPA does not assert here, as it did in *Kaiser*, that its governing statutes *preclude* it from offering power to the DSIs at the IP rate. *See id.* at 849. In fact, BPA makes the opposite assertion: It argues that it *is* statutorily authorized to sell firm power to the DSIs at the IP rate, but is simply choosing not to do so. Thus, BPA's and this Court's justification in *Kaiser* for allowing BPA to sell power at the FPS rate rather than the IP rate — namely, that BPA was precluded by statute from offering the IP rate due to its prior contractual obligation — is wholly absent here. *See Kaiser*, 261 F.3d at 850.

Our interpretation of the governing statutes as requiring that BPA first offer the DSIs power at the IP rate is not only faithful to the statutes' text, it is also more consistent with BPA's own understanding at the time of *Kaiser* and before of the requirements of §§ 839c and 839e. The key claim raised by the DSIs in *Kaiser* was that BPA's decision to offer energy only at the FPS-96 rate schedule was inconsistent with the agency's position in its 1996 Rate ROD concerning the applicability of the FPS-96 and IP-96 rates. *See Kaiser,* 261 F.3d at 849. The position adopted by BPA in the 1996 Rate ROD was, in essence, the opposite of the one that the agency argues here. In the 1996 Rate ROD, BPA stated that

> BPA will not sell power to the DSIs under the FPS rate schedule if it is able to make the sale at the IP rate . . . . Any DSI load that BPA obtains under the FPS schedule rate is load it otherwise would have lost to the competition; BPA will make sales to the DSIs under the FPS rate schedule only when the alternative is the loss of the load. The FPS rate schedule is not an alternative to the IP-96 rate.

*Kaiser*, 261 F.3d at 849 (quoting 1996 Rate ROD). In other words, BPA's position was that it would only sell power to the DSIs at an FPS rate if it was *not* "able to make the sale at the IP rate." *Id.* We relied upon this position of BPA's in *Kaiser*, noting that

> [t]he fact that BPA indicated the IP and FPS rates are not interchangeable, and it will not make sales under the FPS rate when it can make sales at the IP rate, does not answer the question of when BPA is permitted to make sales under the IP rate. If BPA is not permitted to make sales of Surplus Firm Power under the IP rate, then it is not impermissibly substituting the FPS rate for the IP rate.

*Id.* at 850. Following the expiration of BPA's pre-2001 contracts, the "question of when BPA is permitted to make sales under the IP rate," *id.*, now has a different answer, *see* Part III.B.1, *supra*. The interpretation of the NWPA that BPA adopted in the 1996 Rate ROD, and that we upheld as reasonable in *Kaiser,* therefore leads to a different outcome in this case.

As we recently noted, "[a]n agency is entitled to change its course when its view of what is in the public's interest changes[,]" but "an agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored . . . ." *Nw. Envtl. Def. Ctr. v. BPA*, 477 F.3d 668, 687-688 (9th Cir. 2007) (internal quotation marks and citation omitted). Here, BPA does not simply ignore the interpretation of the NWPA that it relied upon in *Kaiser.* Instead, the agency argues that our holdings in that case now support a view of its authority quite contrary to its prior position. In other words, BPA asks us to accept that a change in course is no change at all. An agency that does not admit to have changed its position does not "supply a reasoned analysis" for having done so. *Id.* at 687.

We conclude that *Kaiser* supports, rather than conflicts with, our understanding that BPA does have an obligation to offer the DSIs a cost-based rate — namely, the IP rate — before declaring energy as surplus under § 839c(f) and selling it to the DSIs at a market-based — or other — FPS rate.

#### iv.   The Regional Preference Act

Alcoa goes on to argue at length that the Regional Preference Act precludes BPA from offering power outside of the Pacific Northwest unless it first offers that power to in-region customers at a cost-based rate. As BPA correctly points out, the contracts at issue involve sales of power to customers (the DSIs) who are *in-region* customers; BPA is not, in other words, attempting in the challenged contracts to sell surplus power outside the Pacific Northwest. Moreover, BPA states in footnote 20 of its brief that it

> makes . . . offers [to sell surplus power outside the Pacific Northwest] by postings on its website. If such sales takes place and if, at that time, Alcoa believes BPA has not complied with its obligations under the Regional Preference Act, then Alcoa can challenge such sale(s) by filing a timely petition for review. At this juncture, however, there is no credible issue that arises under the Regional Preference Act.

Resp. Br. at 84 n.20. In light of BPA's assurances that Alcoa can challenge out-of-region power sale contracts and the fact that it has not done so in this action, we hold that Alcoa's RPA-based arguments are not ripe for adjudication at this time.[33]

#### v.   Conclusion

[8] We conclude that BPA's interpretation of its governing statutes as providing authority to sell surplus power to the DSIs under § 839c(f) at an FPS rate without first offering to sell that amount of power under either § 839c(d) or § 839c(f) at a rate set under § 839e(c) is not reasonable. The statutory

---

[33]Should Alcoa later challenge an out-of-region sale in the manner BPA describes, the agency, of course, will be bound by its representation in this case that such a challenge is procedurally proper.

text of the NWPA, the agency's own prior interpretation of the Act, and the NWPA's legislative history, are all to the contrary. We therefore hold that BPA improperly refused to offer the aluminum DSIs energy at a rate set under § 839e(c) before selling them power at an FPS rate.

### b.    The PF rate

[9] Having concluded that BPA must first offer DSIs the IP rate — and in light of Alcoa's failure to identify which cost-based rate it thinks it deserves — we next consider whether the DSIs are also entitled to an offer at the PF rate. We hold that they are not. Section 839e(b), which provides for the establishment of the PF rate, expressly states the customer groups to which that rate applies: "public body, cooperative, and Federal agency customers within the Pacific Northwest and . . . [investor-owned] electric utilities [who participate in the residential exchange program]." § 839e(b). The DSIs are none of these. *See Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003) ("[W]hen the items expressed are members of an associated group . . . the inference [is] that items not mentioned were excluded by deliberate choice . . . .") (internal quotation marks omitted). In addition, the fact that Congress, in the very next subsection, defined a distinct rate applicable specifically — and solely — to "direct service industrial customers" demonstrates that it intended to treat the DSIs separately from those customer groups defined in § 839e(b). *See* § 839e(c). In sum, the plain language of § 839e(b) & (c) permits only one conclusion: that the DSIs are not entitled to the PF rate.

### C.    Monetization of Energy Contracts

Both Alcoa and the Cooperative challenge BPA's authority to offer the DSIs a monetary benefit in lieu of delivering physical power. Alcoa argues that the text, structure, and legislative history of the NWPA require BPA to physically deliver power. The Cooperative contends, likewise, that BPA

lacks statutory authority for the payments to the DSIs, which the Cooperative claims are "subsidies" and barred by the governing statutes. BPA's counter to both of these challenges is that its ability to monetize the DSI contracts is consistent with (1) its statutory mandate to sell power "with a view to encouraging the widest possible diversified use of electric power at the lowest possible rates to consumers consistent with sound business principles," *see* § 838g, and (2) its general authority to enter into contracts, *see* §§ 832a(f), 839f(a). We conclude that BPA's interpretation of its governing statutes is reasonable and that, under appropriate circumstances, BPA may lawfully monetize its energy contracts. Such circumstances, however, do not exist here. We therefore also hold that BPA's decision to monetize the aluminum DSI contracts amounts to an impermissible subsidy of those companies' operations. Because, by its own admission, BPA is not obligated to sell power to the DSIs, its decision to sell power voluntarily at a rate below what it is statutorily required to offer (i.e., the IP rate) and below what it could receive on the open market violates its statutory mandate to act in accordance with "sound business principles." *See* § 838g.

## 1.   **Authority to Monetize Generally**

**[10]** Other than a provision related to the sale of energy to IOUs, *see* § 839c(c), there is no explicit statutory language in the NWPA that either allows or prohibits BPA from monetizing energy contracts. To the extent that "the relevant statutes are silent on the salient issue," we "defer to [BPA]'s [statutory] construction . . . unless that construction is unreasonable." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1169.

**[11]** BPA's explanation of its purported authority to "monetize" the sale of power — that is, to provide the DSIs with money in lieu of physical power — begins with the observation that the agency has broad authority under its governing statutes to enter into contracts. *See* §§ 832a(f) ("Subject only to the provisions of this chapter [of the Project Act], [BPA]

is authorized to enter into such contracts, agreements, and arrangements . . . upon such terms and conditions and in such manner as [it] may deem necessary."), 839f(a) ("Subject to the provisions of this chapter [of the NWPA], the [BPA] is authorized to contract in accordance with [§ 832a(f)]"). Congress also vested BPA with the authority to acquire power, including purchasing energy on the open market, if needed to meet its contractual obligations. *See* § 839d(a)(2)(A) ("[T]he Administrator shall acquire . . . sufficient resources — (A) to meet his contractual obligations . . . ."); *see also Alcoa*, 467 U.S. at 386 & n.5 (noting that the NWPA, for the first time, provided BPA with the "authority to own, construct, or *purchase* the output or capability of electricity generating plants") (emphasis added). And, as already discussed, BPA is authorized by statute to contract with the DSIs for the sale of power, and must offer to do so at the IP rate. *See* Part III.B, *supra*. Because BPA has the statutory authority to sell power to the DSIs at valid contract rates and to purchase at market rates the power needed to service those contracts, it is reasonable for BPA to conclude that it has the authority to simply pay the difference between the valid contract rates and a higher market rate, if any. If BPA places no cap on the amount of its monetary payments to the customer, the customer should be largely indifferent between the payment and the delivery of physical power. Moreover, as BPA asserts, monetization reduces its financial costs because it circumvents the risk that a customer will default on payment after power is physically delivered. When BPA lowers its costs, all customers, including preferential customers, benefit. Thus, monetization, if utilized under appropriate circumstances, is also consistent with BPA's mandate to maintain "the lowest possible rates to consumers consistent with sound business principles." § 838g.

Further, as BPA represents, monetization of energy contracts appears to be a common industry practice, confirming that the practice is not inherently inconsistent with "sound business practices." BPA states that "[l]ong-term power sales

and exchange contracts frequently include provisions that specifically provide the option to cash out an energy delivery under specific circumstances." As evidence of this practice, BPA cites its decision to buy back energy obligations from customers, including DSI customers, during the west coast energy crisis of 2001. Neither Alcoa nor the Cooperative challenges the existence of this general industry practice.

[12] For the above reasons, we hold that BPA can monetize its energy contracts with the DSIs, so long as the decision to monetize is otherwise consistent with BPA's statutory obligations. *See Portland Gen.*, 501 F.3d at 1036-37 (holding that BPA's statutory authority to enter into settlement agreements pursuant to section 2(f) of the Project Act is cabined by the agency's other statutory obligations).

## 2. Monetization of Aluminum DSI Contracts

[13] Despite our conclusion that BPA has, in some circumstances, the statutory authority to monetize its contracts, we hold that monetization of the aluminum DSI contracts was improper. The decision to monetize embodied in the agreements violated other statutory obligations, namely, BPA's mandate to provide "the lowest possible rates to consumers consistent with sound business principles." § 838g. When it committed itself to the particular monetary benefit provisions in the DSI contracts, BPA, in effect, agreed to supply some power to the DSIs — although not as much as they wanted — at a rate that is below both the market rate *and* the IP rate and could be as low as the PF rate.[34] *See* DSI Service ROD

_____

[34]The monetization provisions do not, of course, involve the actual sale of physical power by BPA to the DSIs. Those provisions, however, commit BPA to paying the DSIs the difference between the rate they pay for power on the open market and a rate denominated an FPS rate but essentially equivalent in amount to the PF rate, subject to the limitations discussed at pp. 16528-29, *supra*. Assuming that power is readily available for purchase on the open market by the DSIs, the monetization provisions will therefore achieve a result functionally equivalent to the sale of power by BPA to the DSIs at the baseline rate used to calculate the monetary benefit.

(acknowledging that the rates embodied in the monetization provisions would permit the DSIs to purchase power at a rate below the market *and* below the IP rate). BPA also concedes that its decision to sell power to the aluminum DSIs at below-market and below-IP rates will increase rates for its non-DSI customers. DSI Service ROD ("BPA is mindful that service to the DSIs will come at the expense of higher rates paid by its public preference customers . . . ."). Finally, by its own admission, BPA was not obligated to sell power to the DSIs, and was not obligated to offer a rate below the IP rate if it did sell them power. In essence, BPA has voluntarily agreed to forgo revenues by charging the DSIs a rate below what is authorized by statute (i.e., the IP rate) and below what is available on the open market. These foregone revenues result in higher rates for all other customers. This outcome is in apparent and direct conflict with BPA's statutory mandate, *see* § 838g, and renders BPA's decision to "monetize" the DSI contracts in an amount reflective of those underlying rate decisions — albeit a capped amount — highly suspect.

BPA offers three rationales in an attempt to justify its decision to utilize a below-market and below-IP rate as a base rate for calculating the DSIs' monetary benefit. First, it asserts that offering the DSIs a subsidized rate furthers the agency's mandate to "encourage the widest possible diversified use of electric power." *See* § 839g. Second, BPA suggests that the rate assumptions are consistent with its authority to market power, because the agency already sells power at below cost rates to IOUs under the "residential exchange program" mandated by the NWPA. *See* § 839c(c). Finally, BPA argues that its decision was reasonable because providing aid to long-term customers is in its business interests. Each of these justifications is flawed and therefore incapable of supporting BPA's decision to offer DSIs capped monetized power at a rate below both the IP rate and the market rate. We therefore hold that that decision was unreasonable.[35]

---

[35]There are situations in which BPA's decision to monetize its energy contracts with the DSIs would likely qualify as reasonable. For example,

BPA's first argument — that helping the DSIs furthers its mandate to "encourage the widest diversified use of electric power" — does not justify a sale of power at below market *or* statutorily mandated rates. *See* § 838g. Because, as BPA acknowledges, its rates are "based upon the [BPA]'s total system costs," § 839e(a)(2), a side-effect of the payments to the aluminum DSIs will be an *increase* in the rates paid by a much larger set of customers — the businesses, industries, farms, and residences served by public utilities, electrical cooperatives, and investor-owned utilities with BPA power. Common sense suggests that increasing these rates will cause consumers, overall, to employ electric power for *narrower* and *less diverse* uses. When the price of a particular source of energy goes up, uses of that energy that were affordable or profitable at the old price tend to be less so at the new one. An increase in rates will lead at least *some* consumers to either restrict their usage or substitute another source of power.

Furthermore, BPA's conclusory claim that the contracts will facilitate the diversified use of power could justify almost any sale of power, including an agreement to give power away. Absent a specific explanation as to why sales to the DSIs on more favorable terms than required by statute *or* by market circumstances is necessary to diversify the use of power in the region, the agency's argument is unpersuasive.

if BPA entered into a contract with a DSI at the IP rate (which it is statutorily authorized to do) in order to free up power to sell outside the Pacific Northwest, and the market rate for power exceeded the IP rate, the decision to monetize would probably conform to "sound business principles." In such a case, monetization would reduce the risk of a default by the DSI and would thereby lower BPA's financial costs. Similarly, if BPA entered into a contract with a DSI at a valid contract rate (whether the market rate or the IP rate) and BPA's costs to acquire power rose unexpectedly during the performance of the contract, exercising the option to monetize the now money-losing contract would likely be valid. This situation appears to have occurred during the west coast energy crisis, when BPA chose to monetize several contracts.

BPA's next contention, that the IOU residential exchange program supports its decision to offer the DSI below-cost rates, is likewise untenable. In fact, the program's existence not only fails to support BPA's position, it actually undermines that position. Under the "residential exchange program," BPA exchanges high-priced power generated by the IOUs for low-cost federal energy to be supplied to their residential customers. *See* § 839c(c); *Alcoa,* 467 U.S. at 399. Rather than actually trade power with the IOUs, BPA simply pays the cost differential to the IOUs. *See, e.g., Cent. Elec. Coop., Inc. v. BPA,* 835 F.2d 199, 200-01 (9th Cir. 1987).

But the exchange program is a specific exception that proves a general rule — and the rule is that Congress intended BPA "to operate with a business-oriented philosophy." *See, e.g., Ass'n of Pub. Agency Customers*, 126 F.3d at 1171. As the Supreme Court has observed, "[b]ecause th[e] exchange program essentially requires BPA to trade its cheap power for more expensive power, it is obviously a money-losing program for BPA." *Alcoa,* 467 U.S. at 399. In the case of the exchange program, Congress specifically directed BPA to conduct its operations in a manner that does not conform with the "sound business principles" that the agency is generally required to follow. No such exception to § 838g's statutory mandate applies here. By subsidizing the DSIs' smelter operations beyond what it is obligated to do, BPA is simply giving away money.[36]

There is another provision in the NWPA that authorizes BPA to make monetary payments to specific parties. *See, e.g.,* 16 U.S.C. § 839e(m) (authorizing "annual impact aid payments to the appropriate local governments within the region" affected by BPA power generation or transmission projects). But the DSIs are not among the entities to which any of these payments are authorized. *See id.* Again, the fact that Congress

---

[36]At oral argument, counsel for BPA conceded that "[i]t's not Bonneville's responsibility to ensure that [the DSIs] exist."

explicitly gave permission to BPA to provide subsidies to these other entities weighs against BPA's claim that Congress implicitly authorized it to provide such subsidies as it chooses to the DSIs. *Cf. Tang v. Reno,* 77 F.3d 1194, 1197 (9th Cir. 1996).[37]

The NWPA also specifies certain circumstances in which BPA can sell power to the DSIs at a discounted rate. *See* 16 U.S.C. § 839e(d) (authorizing a "special rate" for power sold to any DSI "using raw materials indigenous to the region as its primary resource"). But § 839e(d) makes clear that such discounts are only available in specific circumstances not present here.[38]

Finally, BPA maintains that the decision to give the DSIs favorable rates of BPA's choosing is authorized because doing so "further[s] BPA's business interests consistent with its public mission." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1171. This Court "defers to the [BPA]'s actions in furthering its business interests." *Id.* at 1171. Still, BPA fails to explain how the payments are consistent with its "mandate to operate with a business-oriented philosophy," *id.*, as it has identified no business interests forwarded by its actions. The

---

[37]The inclusion of a provision for subsidies in the NWPA also counsels somewhat against our deferring to the agency's interpretation of the statute, as it suggests that the question of BPA's authority to make such payments is not one where "Congress has . . . left a void for [the] agency to fill." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1169.

[38]There is no indication that the aluminum DSIs that are to receive the payments "us[e] raw material indigenous to the region as [their] primary resource." § 839e(d)(1). The primary raw material used in aluminum smelting is bauxite, which is imported. *Cf. In re Kaiser Aluminum & Chem. Co.,* 214 F.3d 586, 590 (5th Cir. 2000) (discussing use of imported bauxite in domestic aluminum production). And the legislative history of the subsection confirms that it was not the aluminum DSIs Congress had in mind when it adopted this provision. *See* H.R. Rep. No. 96-976, pt. 2, at 52-53 (1980) ("The Committee is aware of only one [DSI], the Hanna Nickel and Mining and Smelting Company[,] . . . which would meet the criteria of this paragraph.").

agency cites its "historic relationship with the DSIs, the important role the DSIs played in the development of the [federal power systems], and the importance to local economies of DSI jobs" as reasons for the payments. These justifications for simply giving a few of its customers nearly $300 million, however laudable, are simply not reflective of a "business-oriented philosophy," nor do they "further [BPA's] business interests." *Id.*

As we made clear recently in another context, BPA's governing statutes restrain BPA's activities even when, on a pure policy basis, those policies have much to recommend them. *See Portland Gen.*, 501 F.3d at 1036-37. Applying this very basic principle, *Portland General* held that BPA's general statutory authority to enter into settlement agreements under § 832a(f) of the Bonneville Project Act does not allow BPA to avoid the requirements governing power sales to the IOUs simply by labeling such sales as "settlements." 501 F.3d at 1030. Here, similarly, BPA's authority to *sell* power to the DSIs does not mean that BPA may simply *give* money to the DSIs by calling the agreement a "power sale" with "monetized service benefits." In *Portland General*, BPA's actions violated the specific requirements of the REP; here they violate the agency's general statutory mandate to operate like a business. In both cases, however, the lesson is the same: an agency cannot expand its mandate solely through creative use of nomenclature.

[14] In sum, BPA has not advanced a "reasonable interpretation[ ] of its governing statutes" that supports its actions. *Golden Nw. Aluminum Co.*, 501 F.3d at 1045. Nor has the agency shown how offering the DSIs rates below the market rate and below what it is statutorily authorized to offer "further[s] BPA's business interests consistent with its public mission." *Ass'n of Pub. Agency Customers,* 126 F.3d at 1171. We conclude that BPA's decision to offer the subsidized rates to the DSIs and then monetize those rates is inconsistent with BPA's statutory authority under the NWPA, and therefore

hold that the monetization provisions of the aluminum contracts are invalid.

## D.   BPA's Contract with Clallam to Supply Port Townsend

Industrial Customers challenge BPA's decision to supply Port Townsend with power on two related grounds. First, Industrial Customers argues that the rate applicable to the sale is impermissibly low because it is "not the DSI rate, . . . or the market price of electricity" and is instead "designed to closely mimic the low PF rate only available to preference customers." Second, Industrial Customers contends that Port Townsend is a "new large single load" to which the agency's New Resources (NR) rate, a rate higher than both the PF rate, the IP rate, and BPA's forecasted market rate, applies. We agree with Industrial Customers that the Clallam/Port Townsend contract rate is invalid because it commits BPA to sell power to Port Townsend (through Clallam) at a rate below both the market rate and the IP rate. As a result of this holding, we need not reach Industrial Customers' additional argument that the Port Townsend energy contract should be priced at BPA's "New Resources" rate for "new large single loads," rather than at the rate set in the contract.[39]

---

[39]Although we do not decide the "new large single load" question, we note that BPA's contract with Clallam to supply Port Townsend, as currently structured, would likely not qualify as a "new large single load," and BPA would therefore not be obligated to charge Clallam or Port Townsend the NR rate. Section 839a(13) defines a "new large single load" as one that increases the "power requirements" of a public utility such as Clallam, but does not supply a definition for the term "power requirements." BPA attempts to fill this gap by arguing that "power requirements" refers to sales it is required to make to public utilities pursuant to § 839c(b). In light of § 839a(13)'s legislative history, we conclude that the agency's interpretation is reasonable, and therefore entitled to deference.

Congress's intent in passing § 839a(13) was to deter DSI customers from cancelling their direct service contracts with BPA that were priced at the IP rate and, instead, purchasing their power at a lower rate from

**[15]** BPA's contract with Clallam/Port Townsend suffers from the same central deficiency as BPA's contracts with the aluminum DSIs. Namely, BPA, although under no obligation to supply Port Townsend with power, has nonetheless agreed to sell power to the paper company at a rate below both the market rate and the IP rate.[40] The agency provides no unique reasons to explain why supplying Port Townsend with subsidized energy is consistent with "sound business principles."

---

local public utilities served by BPA. *See* H.R. Rep. No. 96-976, pt. 2, at 51. The fear was that, because BPA must serve the firm power requirements of its public utility customers under § 839c(b) at the low PF rate, a sudden increase in those requirements due to strategic behavior by the DSIs could place financial and operating burdens on the agency. *See id.* In other words, the obligation imposed on BPA by § 839c(b) was the driving force behind the "new large single load" provision. BPA's interpretation of "power requirements" as referring to its § 839c(b) obligation is therefore reasonable.

In this case, BPA and Clallam structured their contract as a "surplus firm power" sale under § 839c(f), not as a firm power sale under § 839c(b). Clallam was not exercising its statutory entitlement to firm power at the PF rate, and BPA was under no obligation to enter into the contract. As a result, the BPA/Clallam contract does not appear to be the type of contract to which the preventative NR rate was intended to apply.

[40]The Port Townsend sale is structured somewhat differently than the aluminum DSIs sales in that it involves two separate contracts, rather than a single contract. The first of the two contracts is an agreement between BPA and Clallam, the utility that serves Port Townsend, and provides for the sale of 17 annual aMW of power by BPA to Clallam at the PF rate plus a "typical industrial margin" of $0.57/MWh, for a total cost of approximately $28/MWh. (For a discussion of why this rate, although calculated in a manner which appears to mimic the methodology BPA must follow when determining the IP rate, *see* § 839e(c), is not in fact equivalent to the IP rate, *see* note 28, *supra*.). Under the second contract, Clallam agreed to sell that power to Port Townsend at the BPA/Clallam rate plus "Other Costs" of approximately $0.94/MWh. Through the combined contracts, therefore, BPA has agreed to supply Port Townsend with 17 aMW of power at a rate approximately equal to $29/MWh. This rate is below both BPA's forecasted market rate for 2007-2009 of $42/MWh, *see* DSI Service ROD, and the average IP rate for the year ending September 30, 2007 of $45/MWh.

*See* § 838g. Therefore, for the reasons discussed *supra,* Part III.C.2, BPA's decision to subsidize Port Townsend's energy rates is unreasonable because it is contrary to BPA's statutory mandate.[41] We therefore hold that the Clallam/Port Townsend contract is also invalid.[42]

## E.   Alcoa's Discrimination Claim

[16] Alcoa also challenges BPA's contract with Clallam to supply power to Port Townsend on the ground that it discriminates against other DSIs with regard to both price and method of service. This argument is without merit for at least two reasons. First, BPA's governing statutes do not contain an anti-discrimination requirement that applies to the challenged contracts. Second, even if such a requirement existed, BPA's decision to offer Port Townsend contract terms different from those it offered the aluminum DSIs was justified by Port

---

[41]Even if we considered only the BPA/Clallam contract, our conclusion that the contract rates are invalid would not change. BPA concedes that the "sale of 17 aMW of . . . power to Clallam for service to Port Townsend" is a "discretionary sale," and not one BPA is obligated to make to the public utility under § 839c(b). Because BPA admits it is not required to sell the power to Clallam — and no party argues that Clallam is entitled to the PF or any other cost-based rate under the circumstances involved here — the decision to sell power to Clallam at a below-market rate under the FPS rate schedule violates BPA's mandate to operate according to "sound business principles" for the same reasons that a decision to offer the aluminum DSIs and Port Townsend a subsidized rate does. *See* Part III.C.2, *supra*.

[42]BPA's contract with Clallam/Port Townsend may also run afoul of BPA's statutory requirement to first offer power to a DSI at the IP rate before selling it to the DSI under the FPS rate schedule. *See* Part III.B.2, *supra*. The record is somewhat ambiguous as to whether BPA offered Port Townsend the IP rate. In the DSI Service ROD, BPA indicated it would offer power to Port Townsend "under its market based rate schedule (*or the IP rate if viable*)." Yet, BPA ultimately applied an FPS rate to the Clallam/Port Townsend contract. It can therefore be presumed that BPA did not offer Port Townsend the IP rate. Should BPA decide to enter a future contract with Port Townsend at an FPS rate, it must first offer the company the IP rate.

Townsend's unique characteristics, most notably its small size. We therefore deny this aspect of Alcoa's petition.

Alcoa's primary argument is that § 832d(a), which requires BPA's contracts with "any utility engaged in the sale of electric energy to the general public" to "contain such terms and conditions . . . necessary . . . to insure that resale by such utility to the ultimate consumer shall be at rates which are reasonable and nondiscriminatory," precludes BPA from treating Port Townsend differently from the aluminum DSIs. A plain reading of § 832d(a)'s statutory text — which we have not previously construed — indicates that its purpose is to prevent discrimination by a utility among *its* customers, not discrimination by BPA between utilities and the DSIs, or even among DSIs. Although § 832d(a) may well forbid BPA from entering into a contract with Clallam that permits Clallam to discriminate against the aluminum DSIs, the aluminum DSIs are not seeking service from Clallam. In short, the provision is inapplicable here.[43]

Alcoa's second argument — that the NWPA defines DSIs as a single class of customers and therefore requires BPA to treat them all identically — is also unavailing. The NWPA does define and treat the DSIs as a common class for the purposes of allocating power and setting rates for power sales. *See* §§ 839a(8) (defining DSI); 839c(d)(4)(A) (defining "ex-

---

[43]Similarly off-base is Alcoa's claim that BPA's contract with Clallam is governed by the transmission line requirement contained in 16 U.S.C. § 825s (authorizing the Secretary of Energy "to construct or acquire . . . only such transmission lines and related facilities as may be necessary" to "make the power and energy generated at [federal] projects available in wholesale quantities for sale on fair and reasonable terms"). As we have noted previously, "that phrase refers to the acquisition and construction of *transmission* facilities," *S. Cal. Edison Co. v. Jura,* 909 F.2d 339, 343 n.6 (9th Cir. 1990), but does not constrain BPA's setting of rates for the power it sells once these facilities have been acquired or built. *See id.* at 344 (holding that 16 U.S.C. § 825s does not impose a "substantive nondiscrimination standard for BPA ratemaking").

isting" DSI); 839c(e)(1) (reallocating power which a customer does not require among others in same class); 839e(c)(1)(B) (establishing rates for sale of power to DSIs). And, as already discussed, the NWPA requires BPA to offer its DSI customers firm power at the IP rate before it offers those customers an FPS rate. But once a DSI refuses to buy power at the rate to which it is statutorily entitled (i.e., the IP rate), it has surrendered the primary benefit that the class of DSI customers receives under the NWPA and becomes subject to the same treatment as any other in-region customer seeking to purchase surplus firm power. Perhaps more to the point, nothing in the NWPA suggests that BPA must treat members *within* the same customer class identically. The NWPA authorizes, but does not obligate, BPA to sell power to a DSI. *See* Part III.B.1, *supra*. BPA could therefore refuse to serve some of its DSIs altogether, while supplying the full power requirements of others.

Lastly, even if there were some applicable nondiscrimination requirement in BPA's governing statutes — which, as we have explained, there is not — BPA's different means for supplying the aluminum DSIs and Port Townsend would not be discriminatory. As BPA points out, the considerations associated with serving Port Townsend with 17 aMW of physical power are different from the considerations associated with serving the DSIs with 560 aMW. The latter would expose the agency to much greater risk from fluctuation in energy prices and default by the DSIs.

For all of these reasons, we deny this portion of Alcoa's petition.

### F. Damages Waiver in Aluminum DSI Contracts

The final issue the Cooperative raises is the enforceability of a damages waiver provision that appears in each of the aluminum DSI contracts. *See, e.g.,* Alcoa Contract ("In the event the Ninth Circuit Court of Appeals or other court of compe-

tent jurisdiction issues a final order that declares or renders this Agreement void or otherwise unenforceable, no Party shall be entitled to any damages or restitution of any nature.").[44] The Cooperative argues that the contracts are void *ab initio*, thereby invalidating the waiver provisions. Unless BPA is able to recoup the payments already made to the DSIs, the Cooperative asserts, the Cooperative's members will be stuck with the bill, as the agency will have to recover these costs through higher rates. *See* 16 U.S.C. § 839(g).

BPA's contracts with the DSIs, however, each contain a severability clause, which states that "[i]f any term of this Agreement is found to be invalid by a court of competent jurisdiction then . . . . [a]ll other terms shall remain in force unless that term is determined not to be severable from all other provisions of this Agreement . . . ." The contracts provide for an alternative mode of performance by BPA, delivery of physical power, beginning in FY 2010. The validity of this aspect of the contract is not ripe for review at this time because BPA has not yet exercised its option to deliver physical power, nor has it defined the terms that would govern a physical power sale. So the monetized service benefit provisions of the agreements are, at least potentially, severable from the agreement as a whole, leaving a possibly valid option, the sale of physical power at an as-yet unspecified rate.

In addition, the record does not reveal how BPA believes the damages waiver provision should be construed and, in particular, what effect it is to have if a contract is only partially invalidated. In the Supplemental ROD, BPA rejected as "unreasonable under the circumstances" a proposal by the Cooperative that the contracts with the aluminum DSIs include a provision "*requiring* the [DSIs] to refund payments in the event the Ninth Circuit holds that the contracts are

---

[44]The corresponding waiver provision in the Clallam contract bars only Clallam, not BPA, from recovering damages.

void." (emphasis added). The Agency's reasoning was that even if "the contracts are held void (so that no contract ever existed as a matter of law) and the payments are 'illegal,' " it would be inequitable to require restitution, because

> the companies will have little realistic prospect of operating their smelters . . . [y]et they may, at their own risk and expense, have made commitments with respect to operating their facilities, including making market power purchases, in anticipation of benefits being available.

The actual contract language and factual circumstances here are significantly different from the proposal BPA rejected in the Supplemental ROD. First, invalidating the payments does not necessarily foreclose the DSIs' "prospect[s] of operating their smelters." We do not hold that the contracts are void "as if no[ne] . . . ever existed." Instead, we *affirm* the authority of BPA to sell physical power to the DSIs, § 839c(d), at a valid rate.

**[17]** Second, the question of contractual interpretation before us is whether, if the agreements are partially invalidated, BPA is *permitted* to seek restitution, not whether it is "requir[ed]" to do so. Whether BPA intended to retain the flexibility to seek *or* forgo repayment, depending on (a) the DSIs' "commitments with respect to operating their facilities," and (b) BPA's interest in still making sales of physical power to them, is an issue the agency did not address in the Supplemental ROD. Because, "[f]rom the record before us, we cannot determine BPA's likely course of action," we remand to BPA to determine in the first instance the applicability and construction of the severability clause, the damage waiver, and the physical power sale option in light of our holdings here. *Pub. Util. Dist. No. 1 v. BPA,* 506 F.3d 1145, 1154 (9th Cir. 2007).

**[18]** Finally, the Cooperative's allegation that the waiver provision, if valid, will result in higher rates for non-DSI cus-

tomers is not ripe for adjudication at this time. Until FERC approves the relevant PF rate schedule, this court lacks jurisdiction to review the Cooperative's claim. *See Ass'n of Pub. Agency Customers,* 126 F.3d at 1179; *Pub. Utils. Comm'n of the State of Cal.,* 814 F.2d at 561; *Pub. Utils. Comm'r of Oregon,* 767 F.2d at 629 ("If FERC fails to correct any defects in the methodology [which affected rate-setting], redress is available in the court of appeals," where "any . . . cognizable challenges will be fully reviewable . . . .").

## IV.   Conclusions

We GRANT the Cooperative's and Industrial Customers' petitions as to the challenges they bring regarding BPA's statutory authority to offer the aluminum DSIs and Port Townsend (through Clallam) energy at rates below both the IP rate and the market rate, and REMAND to the agency for determination of the applicability of the agreements' severability and damage waiver provisions in light of our holdings.

We GRANT Alcoa's petition as to its challenge to BPA's refusal to offer the aluminum DSIs the amount of physical power requested at a rate established under § 839e(c) prior to offering them a market-based rate or selling the power outside the region.

We DISMISS the Cooperative and Industrial Customers' petitions as to their challenges to BPA's allocation of costs incurred under the aluminum DSI and Port Townsend contracts to the agency's power rates, as both premature and moot in light of our invalidation of those contracts in pertinent part.

We otherwise DENY the petitions of Alcoa, the Cooperative, and Industrial Customers.

PETITIONS GRANTED IN PART, DENIED IN PART, AND DISMISSED IN PART.